## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| TEXAS MEDICAL TECHNOLOGY INC. f/k/a TEXAS MEDICAL CENTER SUPPLY LLC, | § § § § | |
| | § | Case No. 4:23-cv-01537 |
| Plaintiff, | § § | |
| v. | § § | |
| BERRY GLOBAL INC.; BONLAM, S.A. de C.V.; TEXTILES SHAMEN TEXAS LLC; TEXTILES SHAMEN, S.A. de C.V.; SHLOMO MIZRAHI; and ELIRAN SEGEL, | § § § § § § | |
| Defendants | § | |

---

### BERRY AND BONLAM'S RULE 12(b)(6) MOTION TO DISMISS

---

# TABLE OF CONTENTS

I. Standard of Review ............................................................................................ 2

II. Argument.......................................................................................................... 3

    A.    TMT's breach of contract claim fails................................................... 3

        1.    TMT's breach of contract claim fails because it does not allege consideration. .................................................................................. 4

        2.    TMT's breach of contract claim fails because TMT pleads itself into the statute of frauds. .................................................................. 5

        3.    TMT's breach of contract claim fails because TMT does not allege its breach. .................................................................................. 6

    B.    TMT's claim for breach of the implied warranty of merchantability fails. ......... 8

        1.    TMT's implied warranty of merchantability claim fails because Berry is an upstream component supplier................................. 9

        2.    TMT's implied warranty of merchantability claim fails because it does not allege that manufacturing "Level 3" gowns is the ordinary purpose of the fabric Berry supplied.................................... 11

    C.    TMT's claim for breach of the implied warranty of fitness for a particular purpose fails. ............................................................................ 13

        1.    TMT's implied warranty of fitness for a particular purpose claim fails because Berry is an upstream component supplier. ...................... 13

        2.    TMT alleges neither an "unusual" purpose nor a purpose that went unfulfilled.................................................................................. 13

        3.    TMT's implied warranty of fitness for a particular purpose claim fails because TMT alleges no facts supporting an inference of reliance on Berry.................................................................. 14

    D.    TMT's claims for negligence and negligent misrepresentation fail. ................. 15

        1.    TMT's negligence and negligent misrepresentation claims fail under the economic loss rule................................................................ 16

        2.    TMT's negligent misrepresentation claim fails under Rule 9(b). .......... 17

        3.    TMT's negligent omissions theories should be dismissed because Berry did not have a duty to disclose.................................... 18

E.    TMT's claims for fraud and fraudulent inducement fail. ................................. 18

    1.    TMT does not and cannot plead fraudulent inducement against Berry. ...................................................................................................... 19

    2.    TMT's fraud claim fails under the economic loss rule. ......................... 19

    3.    TMT's fraud claim fails because it does not allege recoverable fraud damages .................................................................................................. 20

F.    TMT's DTPA claims fail. .................................................................................. 21

    1.    DTPA claims cannot be brought by downstream buyers ....................... 21

    2.    TMT's DTPA claims fail because the alleged transaction exceeds the DTPA's maximum transaction size. ................................................. 22

    3.    TMT's misrepresentation-based DTPA claims fail under Rule 9(b). ..... 23

    4.    TMT's warranty-based DTPA claims fail on their own terms. ............. 24

III. Conclusion ................................................................................................................ 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advantage Physical Therapy, Inc. v. Cruse*,
    165 S.W.3d 21 (Tex. App.—Houston [14th Dist.] 2005, no pet.)............................................4

*Anderson v. Durant*,
    550 S.W.3d 605 (Tex. 2018)................................................................................................19

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*,
    297 S.W.3d 768 (Tex. 2009)................................................................................................20

*Arnold v. Williams*,
    979 F.3d 262 (5th Cir. 2020) ............................................................................................3, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................................2

*Baker Hughes Process & Pipeline Servs., L.L.C. v. UE Compression, L.L.C.*,
    938 F.3d 661 (5th Cir. 2019) ...................................................................................................7

*Bakhico Co., Ltd. v. Shasta Beverages, Inc.*,
    1998 WL 25572 (N.D. Tex. 1998).....................................................................................10, 13

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*,
    343 F.3d 719 (5th Cir. 2003)..............................................................................................17, 24

*Berry v. Indianapolis Life Ins. Co.*,
    608 F. Supp. 2d 785 (N.D. Tex. 2009) ...................................................................................23

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,
    572 S.W.3d 213 (Tex. 2019).....................................................................................................18

*In re Building Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab.
    Litig.*,
    2013 WL 1194851 (D.S.C. 2013)...........................................................................................15

*Bynane v. Bank of N.Y. Mellon for CWMBS*,
    866 F.3d 351 (5th Cir. 2017) ....................................................................................................6

*Cheung-Loon, LLC v. Cergon, Inc.*,
    392 S.W.3d 738 (Tex. App.—Dallas 2012, no pet.)...............................................................5

*Coburn Supp. Co., Inc. v. Kohler Co.*,
    342 F.3d 372 (5th Cir. 2003) ...................................................................................................18

iv

*D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*,
    973 S.W.2d 662 (Tex. 1998) ..................................................................16

*Deeds v. Whirlpool Corp.*,
    2016 WL 6070552 (S.D. Tex. 2016) ......................................................14

*E. Hill Marine, Inc. v. Rinker Boat Co., Inc.*,
    229 S.W.3d 813 (Tex. App.—Fort Worth 2007, pet. denied) ................22

*EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*,
    467 F.3d 466 (5th Cir. 2006) ...................................................................5

*General Motors Corp. v. Brewer*,
    966 S.W.2d 56 (Tex. 1998) ....................................................................12

*Gevnison v. Manhattan Constr. Co. of Okl.*,
    449 S.W.2d 458 (Tex. 1969) ....................................................................4

*Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*,
    954 F.3d 804 (5th Cir. 2020) ...........................................................16, 17

*Haase v. Glazner*,
    62 S.W.3d 795 .................................................................................19, 20

*Harris Cty. v. Eli Lilly & Co.*,
    2021 WL 1141420 (S.D. Tex. 2021) ......................................................22

*Hininger v. Case Corp.*,
    23 F.3d 124 (5th Cir. 1994) ..........................................................9, 11, 16

*Klein v. Marvin Lumber & Cedar Co.*,
    2013 WL 12084508 (S.D. Tex. 2013) ....................................................21

*La Sara Grain Co. v. First Nat. Bank of Mercedes*,
    673 S.W.2d 558 (Tex. 1984) ..................................................................24

*LAN/STV v. Martin K. Eby Constr. Co.*,
    435 S.W.3d 234 (Tex. 2014) ..................................................................16

*Mumblow v. Monroe Broadcasting, Inc.*,
    401 F.3d 616 (5th Cir. 2005) ...................................................................4

*PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*,
    146 S.W.3d 79 (Tex. 2004) ....................................................................21

*R2 Restaurants, Inc. v. Mineola Cmty. Bank, SSB*,
    561 S.W.3d 642 (Tex. App.—Tyler 2018, pet. denied) ...........................4

*Ranzy v. Extra Cash of Tex., Inc.*,
  2011 WL 671881 (S.D. Tex. 2011) ................................................................23

*Right Weigh Scale Co., Inc. v. Eaton Corp.*,
  998 F.2d 287 (5th Cir. 1993) ......................................................................12

*River Capital Advisors of N. Car., Inc. v. FCS Advisors, Inc.*,
  2011 WL 831282 (E.D. Tex. 2011) ..............................................................19

*Roark v. Stallworth Oil & Gas, Inc.*,
  813 S.W.2d 492,496. (Tex. 1991)..................................................................4

*Sharyland Water Supply Corp. v. City of Alton*,
  354 S.W.3d 407 (Tex. 2011)........................................................................16

*SPRAJ Props. LLC v. Regions Bank*,
  2015 WL 11120528 (N.D. Tex. 2015)...........................................................22

*Sterling Chems., Inc. v. Texaco Inc.*,
  259 S.W.3d 793 .........................................................................................16

*Sullivan v. Leor Energy LLC*,
  2006 WL 2792909 (S.D. Tex. 2006) ........................................................5, 20

*Teague v. Norcold, Inc.*,
  774 F. Supp. 2d 817 (N.D. Tex. 2011) ...................................................10, 11

*W. Loop Hospitality, LLC v. Houston Galleria Lodging Assocs., LLC*,
  649 S.W.3d 461 (Tex. App.—Houston [1st Dist.] 2022, pet. denied)...................19

*Wright v. Christian & Smith*,
  950 S.W.2d 411 (Tex. App.—Houston [1st Dist.] 1997, no writ)...........................6

*Zorilla v. Aypco Constr. II, LLC*,
  469 S.W.3d 143 (Tex. 2015)........................................................................20

**Statutes**

Tex. Bus. & Com. Code § 2.201(a) ..................................................................5

Tex. Bus. & Com. Code § 2.314(b)(3)..............................................................11

Tex. Bus. & Com. Code § 2.315 .....................................................................14

Tex. Bus. & Com. Code § 17.46(b)(5)...............................................................23

Tex. Bus. & Com. Code § 17.46(b)(7)...............................................................23

Tex. Bus. & Com. Code. § 17.49(g) .............................................................22, 23

TEX. BUS. & COM. CODE § 17.50(a)(2) ........................................................................24

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Berry Global Inc. ("Berry") and Bonlam, S.A. de C.V. ("Bonlam") jointly file this Motion to Dismiss the Original Complaint (Dkt. 1, hereinafter the "Complaint") filed by Plaintiff Texas Medical Technology, Inc. ("TMT").

The crux of TMT's claims is that: (a) Berry[1] made and sold fabric to its co-defendant Textiles Shamen ("Shamen") (Complaint ¶ 17); (b) Shamen used that fabric, with some involvement of TMT itself, to manufacture medical gowns (*id.* ¶¶ 15-16, 19-21); (c) TMT purchased those gowns from Shamen and re-sold them to the government, but the gowns failed to meet the "Level 3" gown standard (*id.* ¶¶ 22, 23); and (d) TMT, as a result, lost its gown-supply contract with the government as well as other unspecified contracts (*id.* ¶¶ 27, 30).

Much of the Complaint is baseless. But even taking TMT's allegations as true, TMT states no actionable claim against Berry.

First, TMT fails to allege a valid contract between itself and Berry—an obvious prerequisite for a breach of contract claim. Instead, TMT alleges only a vague, unilateral, verbal promise by Berry to TMT. That is not an enforceable contract due to lack of consideration, and it also runs afoul of the statute of frauds.

The alleged verbal promise has other problems, too. TMT carefully omits any allegation that Berry promised the fabric it supplied would ultimately result in "Level 3" gowns. "Level 3" is a standard for completed *gowns* (Complaint ¶¶ 24-25), not the *fabric* that is combined with other "various materials" (*id.* ¶ 15) through an "assembly line" process (*id.* ¶ 21) to manufacture

---

[1] For ease of reference and for no other purpose, this Motion refers to Berry and Bonlam collectively as "Berry." As it must, this Motion assumes the truth of the allegation that one or both of the named Berry and Bonlam entities supplied the fabric at issue to Shamen. Nothing in this Motion should be taken to acknowledge the truth of that, or any other, allegation.

completed gowns. Berry did not supply or manufacture the allegedly defective gowns—it is alleged only to have supplied the fabric that ultimately became a component of the gowns. *Id.* ¶ 17. The only allegation against Berry is that it agreed to provide fabric that would meet an (undefined) specification (*id.* ¶ 37), yet there is no allegation that Berry's product failed to meet those fabric specifications at the time of delivery. The only breach or cause-of-injury TMT alleges is that the finished gowns were not Level 3. Even if true, that breach and injury cannot be laid at Berry's feet.

TMT next tries implied warranty claims, but among other dispositive deficiencies, implied warranty claims cannot lie against upstream component suppliers like Berry. *See infra* §§ II.B.1 & II.C.1. The same goes for TMT's Deceptive Trade Practices Act ("DTPA") claims. *See infra* § II.F.1. TMT's negligence claim fails under the economic loss rule, *see infra* § II.D.1, and so do its fraud/misrepresentation claims, in addition to TMT's failure to allege those claims with the particularity prescribed by Rule 9(b), *see infra* §§ II.D & II.E.

If this case survived the pleading stage, discovery would quickly reveal that the gowns' deficiencies—if indeed there were any—had nothing to do with Berry. But even with the benefit of all factual presumptions in its favor, TMT cannot plead a plausible claim against Berry. This Court should therefore enforce Rule 12(b)(6)'s threshold requirement and dismiss the Complaint as to Berry.

## I. Standard of Review

To avoid dismissal of its complaint under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility" means that a court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While the court must accept the facts in the complaint as true, it will not accept as true conclusory

allegations, unwarranted factual inferences, or legal conclusions." *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020).

## II. Argument

### A.    TMT's breach of contract claim fails.

According to the Complaint, the relevant parties are TMT, Shamen, and Berry. TMT purchased from Shamen the "various materials necessary" to manufacture gowns. Complaint ¶¶ 15, 17. Shamen had procured fabric (one of the components necessary to manufacture gowns) from Berry. *Id.* ¶ 17. At TMT's facility, Shamen oversaw the manufacturing of the gowns (i.e., the finished product, combining the various components and packaging the completed gowns). *Id.* ¶¶ 19-20.

Unsurprisingly, TMT had a written "Supply Contract" with its counterparty, Shamen. *Id.* ¶¶ 16-17. TMT alleges that Shamen breached that contract by supplying allegedly defective gowns (or perhaps defective materials/components of gowns—the Complaint is unclear on that point). *Id.* ¶¶ 35-36.

But TMT also alleges a separate breach of contract claim against Berry. That claim, of course, is not based on the written "Supply Contract" between TMT and Shamen, because Berry was not a party to that contract. *See id.* ¶ 17. Instead, TMT claims that while it had a written contract with its counterparty Shamen, it also somehow had a contract with remote manufacturer Berry. According to TMT, un-identified "communications," held by unspecified persons at indeterminate times, created binding obligations running directly from Berry to TMT. *Id.* ¶ 37. Precisely two sentences, according to TMT, suffice to allege the formation of a contract between TMT and Berry, separate from but contemporaneous with TMT's "Supply Contract" with Shamen:

3

> Furthermore, TMT had numerous communications with Berry and Bonlam regarding Level 3 material specifications. Berry and Bonlam agreed to provide the Level 3 gown material in full compliance with the required specification.

*Id.* Those allegations allege neither an enforceable contract nor a contract that, even if enforceable, would have been breached.

### 1.    TMT's breach of contract claim fails because it does not allege consideration.

Consideration is an essential element of an enforceable contract. *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App.—Houston [14th Dist.] 2005, no pet.).[2] It consists of "either a benefit to the promisor or a detriment to the promisee." *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492,496. (Tex. 1991). Importantly, for a contract to arise between two parties, the benefits and detriments must be "to the contracting parties." *R2 Restaurants, Inc. v. Mineola Cmty. Bank, SSB*, 561 S.W.3d 642, 655 (Tex. App.—Tyler 2018, pet. denied).

TMT alleges certain transactions with consideration, but does not allege a transaction between TMT and Berry. Shamen purchased fabric from Berry; this transaction had mutual consideration (Berry provided fabric, and Shamen paid for it). *See* Complaint ¶ 17. The same goes for TMT's subsequent purchase from Shamen. *Id.*

Not so, in contrast, as between TMT and Berry. TMT does not allege that Berry received any benefit, or that TMT took on any detriment, in connection with the purported "contract" arising from unspecified "communications" between TMT and Berry. At most, TMT claims that Berry took on a detriment by "agreeing" to provide fabric meeting the "required specification." *Id.* ¶ 37.

---

[2] With the exception of its DTPA claim (which TMT alleges under Texas law), TMT does not plead the state law under which it asserts its claims. Texas law should therefore apply, because federal courts in Texas apply Texas's choice of law rules when sitting in diversity, *Mumblow v. Monroe Broadcasting, Inc.*, 401 F.3d 616, 620 (5th Cir. 2005), and Texas courts "presume that the law of [other states] is the same as that of Texas" absent contrary "pleading or proof." *Gevnison v. Manhattan Constr. Co. of Okl.*, 449 S.W.2d 458, 465 n.2 (Tex. 1969).

But that alleged consideration is only one-sided—from Berry to TMT—and a "contract is unenforceable" unless it "impose[s] obligations on both parties." *Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 747 (Tex. App.—Dallas 2012, no pet.). TMT paid Shamen—not Berry. Complaint ¶¶ 17, 30. TMT thus does not allege that Berry received anything from TMT in return for Berry's alleged promise to meet the "required specification." Such unilateral consideration is legally insufficient. The contract Berry allegedly breached thus was never formed, and TMT's breach of contract claim fails.

### 2.   TMT's breach of contract claim fails because TMT pleads itself into the statute of frauds.

Although TMT alleges no return promise by itself, it appears to claim that the "contract" between TMT and Berry was a contract to provide goods—namely, fabric. Complaint ¶ 37. Such a "contract for the sale of goods" is within the statute of frauds so long as it is for "$500 or more." TEX. BUS. & COM. CODE § 2.201(a). That means it is unenforceable absent "some writing" evincing the contract and "signed by the party against whom enforcement is sought." *Id.*

Although the statute of frauds is an affirmative defense, dismissal on these grounds under Rule 12(b)(6) is nevertheless appropriate if the defense "appear[s] on the face of the complaint." *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006); *see also, e.g.*, *Sullivan v. Leor Energy LLC*, 2006 WL 2792909, at *2 (S.D. Tex. 2006) (granting motion to dismiss contract claim under statute of frauds). That the contract was oral—or at least unsigned by Berry—appears on the face of the Complaint, because TMT alleges that the so-called "contract" arose only from "communications." Complaint ¶ 37. The only written communications between TMT and Berry described in the Complaint are "emails" in which Berry allegedly requested from TMT "information to open an account with Berry" and "information related to the Product TMT needed." *Id.* ¶ 18.  Those alleged writings are insufficient to take

5

TMT's claim out of the statute of frauds. *See Bynane v. Bank of N.Y. Mellon for CWMBS*, 866 F.3d 351, 361 (5th Cir. 2017) (holding that statute of frauds was not satisfied where plaintiff "did not allege anything about how the" writing "contained sufficient material terms to itself satisfy the statute of frauds"). The remaining alleged communications between TMT and Berry—"phone and video calls"—are plainly oral and thus also insufficient. *See* Complaint ¶ 18.

That the sales price of the fabric was at least $500 also appears on the face of the Complaint. According to TMT, by reselling the gowns manufactured from the fabric Berry provided, TMT "stood to earn profits in the tens of millions of dollars." *Id.* ¶ 14. The only reasonable inference from that allegation is that the price of the fabric Berry sold (allegedly pursuant to a "contract" with TMT) was substantially in excess of $500. The statute of frauds therefore requires any such contract to be reduced to writing to be enforceable, which the Complaint forecloses. TMT's breach of contract claim should therefore be dismissed on this independently sufficient ground.

### 3.    TMT's breach of contract claim fails because TMT does not allege its breach.

In addition to the existence of a valid contract, the elements of a breach of contract claim include a "breach of the contract by the defendant." *Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex. App.—Houston [1st Dist.] 1997, no writ). A "breach" is a violation of the contract from which the alleged damages "result[]." *Id.*

Charitably interpreted, TMT's Complaint alleges that:

1.  Berry agreed to provide "the Level 3 gown material in full compliance with the required specification." Complaint ¶ 37.

2.  Berry "effectively breached" (whatever that means) because the fabric it supplied was "not Level 3 compliant." *Id.* ¶ 38.

3.  TMT alleges it was damaged because the gowns, manufactured by some combination of Shamen and TMT itself, did not meet the "Level 3" gown standard. *See* Complaint ¶¶ 14, 27, 30.

These allegations have critical holes.

First, TMT's breach allegation is inconsistent with what it pleads Berry agreed to provide. There is no allegation that Berry agreed to provide "Level 3 compliant" fabric. Instead, TMT alleges that Berry agreed to meet only an un-named "required specification." There is no allegation that Berry's fabric failed to comply with this specification, nor does TMT allege any damages tied to the specification. Second, there is no allegation that Berry's fabric failed to comply with the applicable specification *at the time of delivery*, which is the time at which the goods' conformity with the contract is measured. *See Baker Hughes Process & Pipeline Servs., L.L.C. v. UE Compression, L.L.C.*, 938 F.3d 661, 666 (5th Cir. 2019) ("A breach of contract claim exists when a party fails to *deliver* the goods as promised." (emphasis added)). The mere allegation that the gowns subsequently did not meet the Level 3 standard, after the manufacturing process performed by parties other than Berry, is thus inadequate to establish any breach by Berry of its only alleged promise.

These absences are no accident. TMT affirmatively pleads that "Level 3" is a standard for "gowns," not a standard for *fabric used in the manufacture of gowns*. *Id.* ¶ 24 (quoting the FDA's explanation of "Level 3" as among the standards for "barrier protection levels of *gowns*" to assure that "the *gown* provides the newly defined levels of protection"). As TMT further affirmatively alleges, "fabric" and "gowns" are by no means synonymous—"fabric" is one ingredient "for use in manufacturing [] gowns." *Id.* at p. 1; *see also id.* ¶ 18 ("Berry and Bonlam knew … that the Product it would supply to Textiles Shamen, would be used in Texas by TMT to make gowns."); *id.* at ¶¶ 19-20 (describing "day to day operations of the manufacturing of the gowns" by defendants other than Berry).

TMT's silence as to the fabric's condition at the time of delivery also speaks volumes. The manufacturing process, as alleged by TMT, is extensive enough to have required TMT to enlist the services of Defendants Segal and Mizrahi to manage it, including by giving "direct orders to personnel on how to assemble the gowns faster" and "how to move from different stages in the assembly line." *Id.* ¶ 21. That is because there are multiple steps between the procurement of fabric and other materials and the creation of a completed gown ("Level 3" or otherwise). Whether the gowns ultimately met the "Level 3" requirements after that process is thus a separate question than whether Berry breached its alleged obligation with respect to fabric.

To be sure, the allegation that Berry promised to meet an agreed-upon "specification"— that is, a *fabric* specification—makes sense. But TMT does not allege that Berry failed to meet that agreed-upon *fabric* specification, or that any damages flow from an un-met specification for *fabric*.

There is thus a fundamental disconnect between Berry's alleged contractual obligation, Berry's alleged breach, and TMT's supposed damages. The only contractual obligation TMT actually pleads is that Berry had to meet the "required specification" for the fabric Berry supplied. TMT does not plead that Berry failed to meet that specification, much less that any such failure existed at the time of delivery (i.e., before TMT and/or Shamen manipulated the fabric during the manufacturing process). Nor does TMT plead any damages caused by that (unpleaded) failure. As a result, TMT has not pleaded a valid breach of contract claim.

**B.      TMT's claim for breach of the implied warranty of merchantability fails.**

TMT alleges that Berry sold Shamen fabric that was "not Level 3 compliant" (Complaint ¶ 47) and that some ambiguous combination of Shamen and TMT used that fabric, in addition to other materials, in manufacturing gowns (*id.* ¶¶ 19-21). According to TMT, gowns that do not

meet "Level 3 standards" "expose[] the user to harm," and thus the fabric Berry sold was "unfit for its ordinary purpose." Complaint ¶ 47.

TMT's implied warranty of merchantability claim fails for two independently sufficient reasons. First, Berry sold fabric, a component of the gowns TMT ultimately acquired and resold; as an upstream component seller, Berry cannot be liable to TMT for implied warranties. Second, TMT does not allege that the "ordinary purpose" of the fabric Berry supplied was the manufacture and use of "Level 3" gowns.

      **1.**      **TMT's implied warranty of merchantability claim fails because Berry is an upstream component supplier.**

As a matter of law, an upstream component supplier cannot be liable in implied warranty to the downstream purchaser of the as-manufactured product. *See Hininger v. Case Corp.*, 23 F.3d 124, 129 (5th Cir. 1994) (holding, under Texas law, that while the purchaser of a finished product may have an implied warranty claim against "the manufacturer of the finished product," it has no such claim against an "upstream component supplier"). The Complaint's allegations place Berry squarely in that upstream-component-seller category.

TMT alleges that "Shamen purchased fabric manufactured by [Berry]," and that, then, "Shamen sold that fabric to TMT." Complaint ¶ 17. But Shamen was not just a fabric middleman or distributor. In addition to the fabric it purchased from Berry, Shamen also acquired other "various materials necessary for the manufacture of Level 3 Gowns." *Id.* ¶ 15. Shamen also manufactured the gowns from the materials Shamen acquired, including fabric from Berry along

9

with other materials. *See id.* ¶ 19 (alleging that Shamen "manage[d] the manufacturing of the Level 3 Gowns in Houston").[3] Shamen then supplied TMT with the finished gowns. *Id.* ¶¶ 17, 35.[4]

That means that Berry, as to TMT, is an upstream *component* supplier. It supplied Shamen with fabric, which was one of the "raw materials" (Complaint ¶ 17) Shamen used to manufacture the gowns in addition to the other "various materials necessary for the manufacture of Level 3 Gowns" (*id.* ¶ 15). Berry was not responsible for sourcing the gowns' various materials or packaging. Berry also had nothing to do with the process by which Shamen combined the fabric and other various materials to form completed gowns, including by "assembl[ing] the gowns" through the various "stages in the assembly line." *Id.* ¶ 21. Just as the "component parts" of a "ready-to-sell canned soft drink" include the "liquid drink" itself as well as the "unfilled cans" and the "cans' lids," each of the fabric and other "various materials" as well as their packaging formed component parts of the ready-to-sell gowns. *See Bakhico Co., Ltd. v. Shasta Beverages, Inc.*, 1998 WL 25572, at *9 (N.D. Tex. 1998) (ruling as a matter of law that upstream component manufacturer could not be liable in implied warranty).

Any doubt as to whether Berry was a "component" supplier is resolved by the reasoning of this line of cases that shield such suppliers from warranty liability. *See, e.g.*, *Teague v. Norcold,*

---

[3] Specifically, according to TMT, Defendant Textiles Shamen, S.A. de C.V. purchased fabric from Berry, as well as the other materials necessary to manufacture the gowns, Complaint ¶¶ 15, 17; Defendant Textiles Shamen Texas, LLC (an affiliate of the other Shamen entity) "manage[d] the manufacturing," *id.* ¶ 19; and Defendants Segal and Mizrahi (owners and officers of both Shamen entities) were "responsible for all day to day operations of the manufacturing of the gowns," *id.* ¶ 20. For present purposes, what matters is that Berry sold fabric to one or more Shamen entities, and then those Shamen entities combined the fabric with other materials before distributing finished gowns to TMT.

[4] Although certain of TMT's allegations are (deliberately or otherwise) vague with respect to whether Shamen sold TMT finished gowns or instead both sold the various components to TMT and also handled the manufacturing process under a separate arrangement, TMT explicitly alleges that "Shamen was obligated to supply TMT with Level 3 compliant materials." Complaint ¶ 35. TMT plainly alleges that "Level 3" is a standard for "gowns," not the components of gowns standing alone. *Id.* ¶ 24. The only fair inference from TMT's Complaint, then, is that Shamen provided gowns—not merely their individual components—to TMT.

10

*Inc.*, 774 F. Supp. 2d 817, 821 (N.D. Tex. 2011) (looking to "the rationale behind the policy of immunizing component part manufacturers from warranty liability for guidance" as to whether product was a "component" or "stand-alone product"). The question turns on what the buyer, in the main, "bargained for." *Id.*; *see also Hininger*, 23 F.3d at 128 (emphasizing that buyer "bargained for a complete and functional [] combine, not wheels and axles and all the myriad components that make up the combine"). If one thing is clear from the Complaint, it is that TMT alleges it bargained for "Level 3" gowns—not the individual components of those gowns. According to TMT, Shamen purchased fabric from Berry in order to "supply TMT with the necessary Level 3 compliant materials." Complaint ¶ 17; *see also id.* ¶ 11 ("This case stems from Defendants' failure to provide Level 3 compliant materials to Plaintiff…."). Again, "Level 3" is a standard for *completed gowns*, not fabric or any other component of those gowns. *See id.* ¶ 24 (quoting FDA guidance explaining that the "Level 3" standard "describes the barrier protection levels of *gowns*," which assures that "the *gown*" provides sufficient protection); *id.* ¶ 25 ("The barrier performance of a level 3 *gown* is a critical safety feature…."). So what TMT bargained for was gowns—not the fabric supplied by Berry.

*Hininger* thus bars TMT's implied warranty of merchantability claim. Berry is an upstream component manufacturer, not the manufacturer of the finished product, as the Complaint readily pleads. This claim should be dismissed accordingly.

> **2.      TMT's implied warranty of merchantability claim fails because it does not allege that manufacturing "Level 3" gowns is the ordinary purpose of the fabric Berry supplied.**

Even if *Hininger* did not bar it, TMT's implied warranty of merchantability claim would fail on its own terms. Such a warranty is an implied assurance that, among other things, the product is "fit for the ordinary purposes for which such goods are used." TEX. BUS. & COM. CODE

§ 2.314(b)(3).[5] TMT, however, conspicuously does not allege facts supporting the inference that the ordinary purpose of the fabric sold by Berry to Shamen is for the manufacturing of "Level 3" gowns. To be sure, TMT does allege, without explanation, that because the as-manufactured gowns were not "Level 3 compliant," the fabric Berry sold was "unfit for its ordinary purpose." Complaint ¶ 47. But the mere statement that the fabric was not fit for its "ordinary use" is the sort of "conclusory allegation" that must be ignored at the Rule 12(b)(6) stage. *See Arnold*, 979 F.3d at 266. TMT alleges precisely zero facts about the actual specifications or nature of the *fabric* Berry supplied, much less facts indicating that the "ordinary use" of such fabric is in "Level 3" gowns.

Put another way, TMT does not allege that the as-specified fabric sold by Berry to Shamen *should* have been used in purportedly "Level 3" gowns. *See Right Weigh Scale Co., Inc. v. Eaton Corp.*, 998 F.2d 287, 291 (5th Cir. 1993) ("Has an aluminum manufacturer breached the implied warranty of merchantability when a construction company builds a bridge out of aluminum when it should have used steel? We think not."). And even if, as a matter of theory or practice, the "required [fabric] specification" to which Berry allegedly agreed (Complaint ¶ 37) *could*, with proper manufacturing processes, result in Level 3 gowns, that does not mean that Level 3 gowns are the "ordinary" use of such fabric. *See General Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998) ("A product which performs its ordinary function adequately does not breach the implied warranty of merchantability merely because it does not function as well as the buyer would like, or even as well as it could.").

Because TMT does not allege that the fabric Berry sold *could* have been used in the manufacture of Level 3 gowns, much less that it *should* have been or *would ordinarily* have been, TMT's implied warranty of merchantability claim fails.

---

[5] TMT alleges no other aspect of merchantability.

### C.   TMT's claim for breach of the implied warranty of fitness for a particular purpose fails.

TMT's allegations related to the implied warranty of fitness for a particular purpose are

sparse:

> Defendants sold goods to TMT and Defendants knew that TMT was the sole supplier of personal protective equipment ("PPE") under a contract. At the time of contracting, Defendants knew that the goods were for a particular purpose because they represented that the goods could fulfill TMT's business needs regarding that particular purpose and the requirements to which TMT was obligated to adhere. TMT relied on Defendants' skill and judgment to select goods for that purpose. Defendants delivered goods that were unfit for TMT's particular purpose.

Complaint ¶ 50.

To be clear, the Court need not delve into this claim because, as an upstream component

seller, Berry cannot be liable to TMT for an implied warranty. But regardless, TMT's pleadings

cannot support an implied warranty of fitness for a particular purpose. The most that can be said

is that TMT alleges a "particular purpose" of manufacturing and selling medical gowns—but that

is neither an "unusual purpose" nor a warranty that is even alleged to have been breached. Also,

TMT's conclusory allegations of reliance on Berry's judgment are insufficient to survive the

12(b)(6) stage.

### 1.   TMT's implied warranty of fitness for a particular purpose claim fails because Berry is an upstream component supplier.

The *Hininger* rule applies to all implied warranties, including the implied warranty of

fitness for a particular purpose. *Bakhico*, 1998 WL 25572, at *9. TMT's claim asserting the implied

warranty of fitness for a particular purpose therefore fails because Berry is an upstream component

supplier. *See supra* § II.B.1.

### 2.   TMT alleges neither an "unusual" purpose nor a purpose that went unfulfilled.

The implied warranty of fitness for a particular purpose arises when "the seller at the time

of contracting has reason to know [1] any particular purpose for which the goods are required and [2] that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." TEX. BUS. & COM. CODE § 2.315. TMT alleges that Berry knew that Shamen would use the fabric to make medical gowns for the government. Complaint ¶¶ 18, 50.  But TMT does not allege that such a purpose would be "unusual," which is fatal to this theory. *See Deeds v. Whirlpool Corp.*, 2016 WL 6070552, at *5 (S.D. Tex. 2016) ("An implied warranty of fitness for a particular purpose does not arise unless the particular purpose differs from the usual and ordinary use of the goods. In other words, the particular purpose must be some unusual, out of the ordinary purpose peculiar to the needs of an individual buyer.").

What is more, there is no allegation that the fabric Berry supplied was unfit for the purpose of fabricating medical gowns. TMT alleges that the fabric was unfit for the purpose of manufacturing "Level 3" gowns, but not that Berry was aware of TMT's intent to manufacture or sell "Level 3" gowns at the time of contracting. TMT claims that it had "communications with Berry and Bonlam regarding Level 3 material specifications," but not that—at the time of contracting—Berry knew the fabric it agreed to supply would be used toward that end. *See* Complaint ¶ 37. The omission of that critical element likewise warrants dismissal.

### 3. TMT's implied warranty of fitness for a particular purpose claim fails because TMT alleges no facts supporting an inference of reliance on Berry.

For an implied warranty of fitness for a particular purpose to arise, the seller must "at the time of contracting ha[ve] reason to know … that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." TEX. BUS. & COM. CODE § 2.315. TMT's Complaint includes only the conclusory statement that "TMT relied on Defendants' skill and judgment to select goods," without any factual allegations supporting that conclusion, and without even a conclusory statement that Berry was aware of that reliance at the time of contracting. Complaint

14

¶ 50. Indeed, the blanket allegation as to "Defendants" says nothing specific at all about Berry. The conclusory statement is inadequate, and the omission of any supporting factual allegations is a further basis to dismiss this claim. *See, e.g.*, *In re Building Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*, 2013 WL 1194851, at *4 (D.S.C. 2013) (granting 12(b)(6) motion where "the Complaint is devoid of any factual allegations concerning [plaintiff's] reliance on [defendant's] judgment to select appropriate shingles for the particular use for which [plaintiff] required the shingles").

### D.   TMT's claims for negligence and negligent misrepresentation fail.

TMT alleges a laundry list of negligent acts and negligent misrepresentations for which Berry is purportedly liable. The negligent acts are alleged failures (1) to properly calibrate, inspect, and test equipment used in manufacturing the fabric, and (2) to properly test the fabric itself. The alleged negligent misrepresentations include one affirmative misrepresentation—that Berry "[mis]represented to TMT that their goods and services were of a certain" but unspecified "use and quality." Complaint ¶ 53. TMT also alleges two actionable omissions, namely (1) "failing to disclose" unspecified "information about the [fabric]," and (2) "failing to disclose" unspecified "information about the equipment used to manufacture" the fabric. *Id.* ¶ 54.

The sole factual support for such allegations is found in TMT's recitation of the so-called "Berry Call," which allegedly took place in September 2021, months after the sale of the fabric at issue. TMT claims that, on this call, Berry personnel "admitted" that the fabric they supplied would not suffice for the manufacture of Level 3 gowns, and that certain modifications to equipment and processes would be required to certify, in the future, that fabric sold by Berry would suffice for the manufacture of Level 3 gowns. Complaint ¶ 28.

TMT mischaracterizes the "Berry Call." But even assuming TMT's characterization is true, as Berry must at this stage, TMT's allegations of negligence and misrepresentation cannot survive

12(b)(6). Both are doomed by the economic loss rule, and the misrepresentation claims fail for additional reasons, including Rule 9(b) and the absence of any allegations supporting an inference of a duty to disclose.

### 1. TMT's negligence and negligent misrepresentation claims fail under the economic loss rule.

"[U]nder Texas law, a plaintiff cannot recover economic losses resulting from a defective product based on a negligence theory." *Hininger*, 23 F.3d at 126. The same rule applies to negligent misrepresentation claims. *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998); *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex. App.—Houston [1st Dist. 2007, pet. denied).

The economic loss rule exists to assure that claims that should sound in contract are not recrafted as tort claims. *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 240 (Tex. 2014). The rule applies whether or not the parties are in contractual privity, including as specifically between "a remote manufacturer and a consumer." *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011).

As applied to claims, like TMT's, alleging defective products, "[w]hen a defect in a product deprives a buyer of profits, those are purely economic damages recoverable only in contract." *Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804, 808 (5th Cir. 2020); *see also Hininger*, 23 F.3d at 126-27 (applying this rule to a tort claim against an upstream component supplier). And although claims alleging "property damage" may sometimes escape the economic loss rule, TMT cannot construe its claim as one for damage to the gowns caused by allegedly defective fabric: "If a product was purchased as a complete whole, damage to that product caused by one of its component parts is considered damage to the product itself—rather than damage to other property—and limited to recovery in contract by the economic

loss rule." *Golden Spread*, 954 F.3d at 809. The only damages TMT alleges are its lost profits on its contract with the government and other unspecified customers. Complaint ¶¶ 14, 27, 30. Those are archetypal economic losses that must be recovered, if at all, in contract.

### 2. TMT's negligent misrepresentation claim fails under Rule 9(b).

Federal Rule of Civil Procedure 9(b) raises the standard for fraud claims beyond the typical "plausibility" pleading standard, instead requiring that the complaint "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The rule applies to negligent misrepresentation claims when, as here, "fraud and negligent misrepresentation claims are based on the same set of alleged facts." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003); *compare* Complaint ¶ 53 (alleging negligent misrepresentation based on representation that "goods and services were of a certain use and quality"), *with id.* ¶ 57 (alleging fraud based on identical representation).

Rule 9(b) requires, at a minimum, "allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby." *Benchmark Elecs.*, 343 F.3d at 724. This requirement is often short-handed to "the who, what, when, where, and how" of the alleged fraud or misrepresentation. *Id.*

TMT's allegations come nowhere close to that standard. TMT does not say who at Berry made the allegedly negligent misrepresentations. TMT does not say when they were made, to whom they were made, or the medium by which they were made. Nor does TMT provide any detail regarding what was actually said. In a product defect case, it is difficult to imagine more vague allegations than TMT's claims that Berry represented its product was "of a certain [unspecified] use and quality" (Complaint ¶ 53) or alleged failures to disclose "[unspecified] information about the Product" (Complaint ¶ 54). These claims thus fail Rule 9(b).

      **3.**    **TMT's negligent omissions theories should be dismissed because Berry did not have a duty to disclose.**

At least two of TMT's negligent misrepresentation theories are based on omissions: namely, that Berry "fail[ed] to disclose to Plaintiff information about the Product" and that Berry "fail[ed] to disclose to Plaintiff information about the equipment used to manufacture the Product material." Complaint ¶ 54(e, f). Such "non-disclosures cannot be negligent unless there is a duty to disclose." *Coburn Supp. Co., Inc. v. Kohler Co.*, 342 F.3d 372, 377-78 (5th Cir. 2003).

TMT alleges no facts supporting an inference that Berry owed it a duty to disclose. "In general, there is no duty to disclose without evidence of a confidential or fiduciary relationship." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019). But there is no fiduciary duty owed in an arms' length commercial relationship, and TMT does not allege that "the parties ha[d] dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest," as could give rise to an informal confidential relationship. *See id.* Neither does TMT allege that Berry (1) made a representation before discovering new information making the earlier statement untrue or misleading, (2) made a partial disclosure creating a false impression, or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth. *Id.* TMT's non-disclosure theories should therefore be dismissed.

      **E.**    **TMT's claims for fraud and fraudulent inducement fail.**

TMT's threadbare fraud claims (Complaint ¶¶ 56-57) against Berry should be dismissed for two of the same reasons as its negligent misrepresentation claims: Rule 9(b) and the economic loss rule.[6] In addition, although TMT styles its claim as one including a "fraudulent inducement

---

[6] TMT's fraud allegations are, if anything, even more sparse than its negligent misrepresentation allegations. *See* Complaint ¶ 57. Rather than belabor the point, Berry incorporates its above discussion of Rule 9(b). *See supra* § II.D.2.

theory," any such theory fails because there was no enforceable contract between TMT and Berry (much less one that TMT claims was fraudulently induced), and TMT cannot recover the only damages it alleges on a fraud theory.

### 1. TMT does not and cannot plead fraudulent inducement against Berry.

Fraudulent inducement is a special species of common-law fraud in which a misrepresentation results in the execution of an enforceable contract. As such, "the existence of a contract is an essential part of its proof." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *see also River Capital Advisors of N. Car., Inc. v. FCS Advisors, Inc.*, 2011 WL 831282, at *6 (E.D. Tex. 2011) ("Since there is no agreement between Plaintiff and Defendants, Plaintiff's fraudulent inducement claim is not plausible and should be dismissed.").

At the threshold, it bears emphasis that TMT does not so much as *allege* that the purported contract between TMT and Berry resulted from one of Berry's alleged misrepresentations. Any fraudulent inducement claim against Berry should be dismissed for that reason alone. *See Haase v. Glazner*, 62 S.W.3d 795, 798 (holding that "[w]hen a party has not been induced into a contract, … there is no detrimental reliance and therefore no fraudulent inducement claim").

In addition, as explained above, the alleged contract between TMT and Berry fails both for lack of consideration, *see supra* § II.A.1, and under the statute of frauds, *see supra* § II.A.2. So too, then, does TMT's fraudulent inducement claim. *See Haase*, 62 S.W.3d at 798 ("Without a binding agreement, there is no detrimental reliance….").

### 2. TMT's fraud claim fails under the economic loss rule.

Because TMT does not (and cannot) plead a claim for fraudulent inducement, the economic loss rule bars its fraud claim. The "Texas Supreme Court has carved out an exception to the economic loss rule for fraudulent inducement claims," but not for ordinary fraud claims (i.e., fraud that does not result in the execution of a binding contract between the parties). *W. Loop Hospitality,*

*LLC v. Houston Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 487-88 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). TMT's fraud claim therefore fails alongside its other tort claims. *See supra* § II.D.1.

### 3.   TMT's fraud claim fails because it does not allege recoverable fraud damages.

As explained above, the alleged "contract" between TMT and Berry is unenforceable both because it lacks consideration and because of the statute of frauds. *See supra* §§ II.A.1 & II.A.2. That means that TMT can recover only "out-of-pocket damages incurred in relying upon [the] alleged misrepresentation," not the "benefit of the bargain damages" that would be recoverable under an enforceable contract. *Haase*, 62 S.W.3d at 799; *see also Zorilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) ("[A]bsent an enforceable contract, a fraud claimant may not recover benefit-of-the-bargain damages.").

But TMT pleads only benefit-of-the-bargain damages. Specifically, TMT alleges that it lost profits on the government contract for which it acquired gowns from Shamen, as well as contracts with other customers. Complaint ¶¶ 27, 30. Those are benefit-of-the-bargain damages. *See Zorilla*, 469 S.W.3d at 153 ("Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised."); *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 776 (Tex. 2009) ("Under the benefit-of-the-bargain measure, lost profits on the bargain may be recovered….").

Because TMT alleges no damages recoverable in fraud, its fraud claim should be dismissed. *See, e.g.*, *Sullivan v. Leor Energy LLC*, 2006 WL 2792909, at *7 (S.D. Tex. 2006) (granting motion to dismiss fraud claim where plaintiff "is seeking benefit of the bargain damages").

### F.        TMT's DTPA claims fail.

TMT's DTPA claims are variations on its misrepresentation and warranty claims. They fail as matter of law because, as to Berry, TMT is a downstream buyer (not a direct purchaser). And even if TMT were a direct purchaser, TMT's pursuit of millions of dollars in damages plainly pleads a transaction size in excess of the DTPA's maximum. In addition, TMT's DTPA theories fail for the same reasons as its other theories: the misrepresentation theories fail under Rule 9(b), and the implied warranty theories are not available as against component manufacturers.

### 1.        DTPA claims cannot be brought by downstream buyers.

There is no disputing that, as to Berry, TMT is a downstream buyer, not a direct purchaser. According to TMT, "Textiles Shamen purchased fabric manufactured by Defendants Berry [] and Bonlam. Textiles Shamen [then] sold that fabric to TMT." Complaint ¶ 17.

That alone means TMT's DTPA claims fail. A "downstream buyer … *cannot* sue under the DTPA." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex. 2004).[7] The prohibition on claims by downstream purchasers applies to any and all theories of DTPA liability, whether sounding in misrepresentation, warranty, or otherwise:

> The Texas Supreme Court has made clear that DTPA claims based on allegedly false, misleading, or deceptive acts cannot be brought against remote, or 'upstream,' manufacturers or suppliers. Furthermore, although the *Amstadt* decision dealt only with DTPA laundry list and unconscionability claims, the court has since explained that its decision leaves no basis for distinguishing breach-of-warranty DTPA claims. … Therefore, *Amstadt* and its progeny apply to all of Plaintiff's claims in this case.

*Klein v. Marvin Lumber & Cedar Co.*, 2013 WL 12084508, at *4 (S.D. Tex. 2013) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649-50 (Tex. 1996); *PPG Indus.*, 146 S.W.3d at 88 n.37).

---

[7] Unlike the *Hininger* rule barring implied warranty claims against upstream "component" manufacturers (as opposed to other remote sellers), this rule bars DTPA claims against all upstream sellers, whether or not the upstream seller is merely a "component" manufacturer. *See PPG Indus.*, 146 S.W.3d at 89.

2. **TMT's DTPA claims fail because the alleged transaction exceeds the DTPA's maximum transaction size.**

The purpose of the DTPA is to protect consumers, not participants in large commercial transactions. As a result, it contains a large-transaction exemption. The DTPA does not apply "to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000." TEX. BUS. & COM. CODE. § 17.49(g); *see also E. Hill Marine, Inc. v. Rinker Boat Co., Inc.*, 229 S.W.3d 813, 820 (Tex. App.—Fort Worth 2007, pet. denied) (explaining that the purpose of the large-transaction exemption is to "maintain the DTPA as a viable source of relief for consumers in small transactions" but "remove litigation between businesses over large transactions from the scope of the DTPA").

That exemption is an affirmative defense, but TMT pleads straight into it. *See Harris Cty. v. Eli Lilly & Co.*, 2021 WL 1141420, at *4 (S.D. Tex. 2021) (explaining that "dismissal under Rule 12(b)(6) may still be appropriate if the defense appears on the face of the complaint"). According to TMT, under its government contract, "TMT stood to earn profits"—not just revenues—"in the tens of millions of dollars." Complaint ¶ 22. Even assuming a 100% markup above TMT's material costs, that means that TMT expected to *pay* "tens of millions of dollars" for the materials that ultimately became the gowns. TMT cannot contend that the "total consideration" it paid was less than $500,000.

Neither can TMT dispute that the transactions at issue were "relate[d] to the same project." *See* TEX. BUS. & COM. CODE. § 17.49(g). For purposes of the DTPA's large-transaction exemption, a "project" is any one "planned undertaking," such that even a "long running distribution relationship between two parties constitute[s] a project." *SPRAJ Props. LLC v. Regions Bank*, 2015 WL 11120528, at *7 (N.D. Tex. 2015). The project to which the transactions at issue "related"

was—as alleged in the very first sentence of the Complaint—TMT's "contract to provide the United States Government with Level 3 medical gowns." The fabric Berry provided to Shamen was "for use in manufacturing those gowns." Complaint at 1. TMT entered into a (singular) Supply Contract with Shamen so that TMT could perform under its (singular) government contract, *id.* ¶ 15, and Shamen purchased fabric from Berry to that end, *id.* ¶ 16. The transactions at issue are, thus, alleged to be rooted in—or at least "related to," *see* TEX. BUS. & COM. CODE. § 17.49(g)— TMT's government supply contract. That makes them part of a single project, in connection with which TMT plainly paid more than $500,000. TMT's DTPA claims therefore should be dismissed under the statute's large-transaction exemption.

### 3.    TMT's misrepresentation-based DTPA claims fail under Rule 9(b).

TMT alleges three theories of DTPA liability, two of which sound in misrepresentation: namely, the prohibition on "representing that goods or services" have certain qualities "they do not have" (TEX. BUS. & COM. CODE § 17.46(b)(5)), and the prohibition on "representing that goods or services are of a particular" quality "if they are not" (*id.* § 17.46(b)(7)). Complaint ¶ 59(a, b). These are essentially the same allegations upon which TMT's fraud claims are based. *Compare id.* ¶ 57 (alleging that "Defendants represented to Plaintiff that their goods were of a certain use and quality….").

Because DTPA claims like these are essentially fraud claims with potential damages enhancements, "[i]t is well-established that claims alleging violations of the DTPA are subject to the requirements of Rule 9(b)." *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 800 (N.D. Tex. 2009); *see also Ranzy v. Extra Cash of Tex., Inc.*, 2011 WL 671881, at *5 (S.D. Tex. 2011) (explaining that Rule 9(b) applies to DTPA claims when "the underlying claims involve[] fraud").

As with its fraud claims, TMT fails to allege the "particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and

what he obtained thereby" with respect to its misrepresentation-based theories of DTPA liability. *See Benchmark Elecs.*, 343 F.3d at 724; *see also supra* § II.D.2. The DTPA claims should therefore be dismissed.

### 4.      TMT's warranty-based DTPA claims fail on their own terms.

The third and final DTPA theory that TMT alleges is "breach of express or implied warranties." *See* TEX. BUS. & COM. CODE § 17.50(a)(2). TMT alleges no express warranty by Berry. *See* Complaint ¶¶ 41-42 (alleging express warranties from Shamen, but not Berry). And because the DTPA "does not create any warranties," such that "any warranty must be established independently of the act," *La Sara Grain Co. v. First Nat. Bank of Mercedes*, 673 S.W.2d 558 (Tex. 1984), TMT's implied warranty theories fail for the reasons explained above. *See supra* §§ II.B & II.C.

### III. Conclusion

TMT makes no legal or factual allegations against Berry or Bonlam in connection with TMT's claims for breach of express warranty, unjust enrichment, money had and received, and conversion. Those claims are pled against Shamen alone. Because the claims that TMT purports to bring against Berry and Bonlam should be dismissed, Berry and Bonlam respectfully request that TMT's claims against Berry and Bonlam be dismissed with prejudice in their entirety.

Dated: July 18, 2023                                             Respectfully submitted,

                                                                 */s/ Brice A. Wilkinson*

                                                                 GIBBS & BRUNS LLP
                                                                 Brice A. Wilkinson
                                                                 State Bar No. 24075281
                                                                 Federal ID No. 1277347
                                                                 Mark A. Giugliano
                                                                 Texas Bar No. 24012702
                                                                 Federal ID No. 29171

mgiugliano@gibbsbruns.com
Jorge M. Gutierrez
Texas Bar No. 24106037
Federal ID No. 3157999
jgutierrez@gibbsbruns.com
Michael R. Davis
Texas Bar No. 24109793
Federal ID No. 3588027
mdavis@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel.: (713) 751-5258
Fax: (713) 750-0903

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
Adam W. Green
Texas Bar No. 24027191
agreen@bakerdonelson.com
Katriel C. Statman
State Bar No. 24093197
kstatman@bakerdonelson.com
1301 McKinney, Suite 3700
Houston, Texas 77010
Tel.: (713) 650-9700
Fax: (713) 650-9701

## CERTIFICATE OF SERVICE

I certify that on July 18, 2023, I electronically served all counsel of record by filing this Motion via the Court's CM/ECF system.

*/s/ Brice A. Wilkinson*_____
Brice A. Wilkinson