In the United States District Court
Southern District of Texas
Houston Division

| | | |
|---|---|---|
| Texas Medical Technology Inc. | § | |
| f/k/a Texas Medical Center Supply | § | |
| LLC | § | |
|     Plaintiff | § | Cause No. 4:23-cv-01537 |
| | § | |
| v. | § | |
| | § | |
| Berry Global Inc. | § | |
| Bonlam, S.A. de C.V. | § | Jury Demanded. |
| Textiles Shamen Texas LLC | § | |
| Textiles Shamen, S.A. de C.V. | § | |
| Shlomo Mizrahi | § | |
| Eliran Segal | § | |
|     Defendants | § | |

**Plaintiff's Response to Berry and Bonlam's Rule 12(b)(6)
Motion to Dismiss (Dkt. 20)**

# Table of Contents

Table of Authorities ..................................................................................... iii

Introduction .................................................................................................. 1

Standard of Review ....................................................................................... 1

Plaintiff's Allegations ................................................................................... 2

Arguments & Authorities ........................................................................... 11

A. Breach of Implied Warranties ............................................................... 11

   1.  TMT and Berry both expected Berry to resolve any issues with
the fabric. .............................................................................. 12

   2.  Berry's fabric was not merchantable. ...................................... 14

   3.  Berry may be liable whether TMT's use of Berry's fabric was in
accordance with its ordinary purpose or an unusual purpose. .............. 14

   4.  TMT relied on Berry's skill and judgment in supplying the
particular fabric it needed. ....................................................... 15

B. Negligence / Negligent Misrepresentation ........................................... 15

   1.  TMT properly alleged the elements of negligent
misrepresentation. ................................................................... 15

   2.  The economic loss rule does not prevent TMT's recovery. ..................... 17

   3.  Berry's partial disclosures imposed a duty to disclose. ......................... 18

C. Fraud / Fraudulent Inducement ........................................................... 19

D. Breach of Contract ............................................................................... 20

E. DTPA ...................................................................................................... 23

F. Intention to Amend ............................................................................... 23

Conclusion and Prayer ................................................................................ 23

Certificate of Service .................................................................................. 25

# Table of Authorities

## *Cases*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................2

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................2

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings LLC*, 572 S.W.3d 213 (Tex. 2019) .........................................................................................18

*D.S.A. Inc. v. Hillsboro I.S.D.*, 973 S.W.2d 662 (Tex. 1998) ............................17

*Formosa Plastics Corp. USA v. Presidio Engineers & Contracting Inc.*, 960 S.W.2d 41 (Tex. 1998) ...............................................................................20

*Hininger v. Case Corp.*, 23 F.3d 124 (5th Cir. 1994) ..................................12–13

*MAN Engines & Components Inc. v. Shows*, 434 S.W.3d 132 (Tex. 2014)......12

*Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137 (5th Cir. 2007)......................................................................................................................2

*Nobility Homes of Texas Inc. v. Shivers*, 557 S.W.2d 77 (Tex. 1977)..............12

*Sharyland Water Supply v. City of Alton*, 354 S.W.3d 407 (Tex. 2011) ..........20

*Sterling Chemicals Inc. v. Texaco Inc.*, 259 S.W.3d 793 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)..............................................................17

*Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex. 1983)...........................................20

*West Loop Hospitality LLC v. Houston  Galleria Lodging Associates LLC*, 649 S.W.3d 461 (Tex. App.—Houston [1st Dist.] 2022, pet. denied)......21

## *Statutes and Rules*

Fed. R. Civ. P. 8.................................................................................................15

Fed. R. Civ. P. 9.................................................................................................17

Tex. Bus. Com. Code § 2.314 .....................................................................11, 14

Tex. Bus. Com. Code § 2.315 ....................................................................11–12

Tex. Bus. Com. Code § 17.49 ............................................................................23

## *Other Authorities*

Restatement (Second) of Torts § 552B (1977).....................................................17

TMT is opposed to Berry and Bonlam's motion to dismiss because TMT's Complaint stated plausible claims against Berry and Bonlam.

## Introduction

Berry, in consultation with Textiles Shamen and TMT,[1] agreed to manufacture fabric that Textiles Shamen would sell to TMT and TMT would use such fabric to make Level 3 Gowns pursuant to a supply contract with the federal government. To qualify as a Level 3 Gown, the fabric must meet certain specifications. Berry knew why Textiles Shamen ordered the fabric, knew why TMT needed the fabric, and knew what the specifications were for Level 3 Gowns. And yet Berry produced defective fabric that caused TMT to provide defective Level 3 Gowns, resulting in a recall and millions of dollars of damages to TMT.

Consequently, TMT sued Berry and Textiles Shamen. Dkt. 1. Berry responded first, filing a motion to dismiss under Rule 12(b)(6). Dkt. 20. In the motion, Berry argues that every single claim TMT asserted against it fails for one reason or another. As set forth below, the Court should deny Berry's motion.

## Standard of Review

Rule 12(b)(6) authorizes a court to dismiss a complaint for failure to state

---

[1] "Berry" refers collectively to Defendants Berry Global Inc. and Bonlam, S.A. de C.V. "Textiles Shamen" refers collectively to Defendants Textiles Shamen Texas LLC and Textiles Shamen, S.A. de C.V. "TMT" refers to Plaintiff Texas Medical Technology Inc.

a claim. A complaint will survive such a motion if the plaintiff alleges enough facts to state a claim to relief that is plausible on its face. *See Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 140 (5th Cir. 2007). To show facial plausibility, the plaintiff should "plead[]factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing a defendant's motion, the Court should assume that all the allegations in the complaint are true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## Plaintiff's Allegations[2]

11.     This case stems from Defendants' failure to provide Level 3 compliant materials to Plaintiff, causing Plaintiff to sustain substantial damages.

12.     Plaintiff Texas Medical Technology Inc. f/k/a Texas Medical Center Supply LLC ("TMT") is a medical equipment supply company based in Houston, Texas. TMT manufactures, supplies and distributes medical safety equipment including personal protective equipment, such as facemasks, vinyl, latex, nitrile gloves, patient gowns, lab coats, and hand sanitizers. Due to the nature of the equipment, their intended uses are part and parcel to safety.

13.     The DLA[3] is the agency responsible for procurement for the United

---

[2] For ease of reference, these paragraphs maintain the numbering in Plaintiff's Original Complaint. Dkt. 1.

[3] The Defense Logistics Agency.

2

Stated armed forces and related agencies. The DLA entered contract SPE1C1-21-D-1421 (the "DLA Contract") with an entity called At Ease Sustainment, LLC for the procurement of level 3 surgical gowns ("Level 3 Gowns").[4]

14.    Under the DLA Contract, TMT was approved as the sole manufacturer of Level 3 Gowns to be supplied to the U.S. Government under between At Ease and the DLA in 2020. As the sole manufacturer under the DLA Contract, TMT stood to earn profits in the tens of millions of dollars.

15.    Following TMT's designation, TMT communicated with Defendants Shlomo Mizrahi and Eliran Segal, as representatives of Defendant Textiles Shamen, S.A. de C.V. ("Textiles Shamen"), and entered into a supply contract. Pursuant to the supply contract, Textiles Shamen was to supply TMT with various materials necessary for the manufacture of Level 3 Gowns ("TS Supply Contract").

16.    Under the terms of the TS Supply Contract, Textiles Shamen represented and warranted that it "must act with the highest standards of quality and professionalism in the delivery of the PRODUCT, in accordance with this Contract." Additionally, Textiles Shamen represented and warranted that the Product supplied "must fulfil all technical specifications for the PRODUCT, as well as with the specifications for its individual packaging." TMT relied on these representations and warranties to fulfill its business

---

[4]    https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns.

obligations with third parties, such as the DLA.

17.     To supply TMT with the necessary Level 3 compliant materials, Textiles Shamen purchased fabric manufactured by Defendants Berry Global Inc. and Bonlam, S.A. de C.V. Textiles Shamen sold that fabric to TMT (the "Product"). Specifically, all purchases of the Product were manufactured using raw materials produced exclusively by Berry and Bonlam.

18.     Prior to Berry and Bonlam manufacturing the Product, Berry reached out to TMT on many occasions. Berry sent numerous emails and set up phone and video calls with TMT requesting information to open an account with Berry and information related to the Product TMT needed to be sent to its Houston facility. Berry and Bonlam knew, before the manufacture of the materials, that the Product it would supply to Textiles Shamen, would be used in Texas by TMT to make gowns.

19.     Furthermore, Segal and Mizrahi formed Textiles Shamen Texas, LLC to manage the manufacturing of the Level 3 Gowns in Houston. Segal and Mizrahi were to check the quality of the Product at the Textiles Shamen facility, send the Product to additional testing, and manage operations at TMT's Houston facility.

20.     Additionally, Segal and Mizrahi, as individuals, entered into an operating agreement with TMT, where Segal and Mizrahi agreed to be responsible for all day to day operations of the manufacturing of the gowns.

21.     Between February 2021 and April 2021, Segal and Mizrahi flew to

4

Houston almost every two weeks and stayed in the TMT facility for many days at a time to ensure the quality of the Product and correct assembly of the gowns. While at the TMT Houston facility, Segal and Mizrahi also gave direct orders to personnel on how to assemble the gowns faster, how to move from different stages in the assembly line, and how the product should be packaged. Segal and Mizrahi represented to TMT that they had been conducting this type of quality control for over 30 years and have both the experience and knowledge to advise TMT on the manufacturing process.

22.     TMT supplied hundreds of thousands of units of the Product to the DLA.

23.     In April 2021, prior to using the Product, the DLA informed At Ease and TMT that the Products failed to meet the requisite criteria for Level 3 Gowns.

24.     Pursuant to the FDA:

> Gowns are examples of personal protective equipment used in health care settings.  They are used to protect the wearer from the spread of infection or illness if the wearer comes in contact with potentially infectious liquid and solid material. They may also be used to help prevent the gown wearer from transferring microorganisms that could harm vulnerable patients, such as those with weakened immune systems.  Gowns are one part of an overall infection-control strategy.

> A few of the many terms that have been used to refer to gowns intended for use in health care settings, include surgical gowns, isolation gowns, surgical

isolation gowns, nonsurgical gowns, procedural gowns, and operating room gowns. In 2004, the FDA recognized the consensus standard American National Standards Institute/Association of the Advancement of Medical Instrumentation (ANSI/AAMI) PB70:2003, "Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities."

New terminology in the standard describes the barrier protection levels of gowns and other protective apparel intended for use in health care facilities and specifies test methods and performance results necessary to verify and validate that the gown provides the newly defined levels of protection:

> **Level 1:** Minimal risk, to be used, for example, during basic care, standard isolation, cover gown for visitors, or in a standard medical unit

> **Level 2:** Low risk, to be used, for example, during blood draw, suturing, in the Intensive Care Unit (ICU), or a pathology lab

> **Level 3:** Moderate risk, to be used, for example, during arterial blood draw, inserting an Intravenous (IV) line, in the Emergency Room, or for trauma cases

A surgical gown is a personal protective garment intended to be worn by health care personnel during surgical procedures to protect both the patient and health care personnel from the transfer of microorganisms, body fluids, and particulate matter.[5]

---

[5] https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns

The level 3 ANSI/AAMI designation means that the surgical gowns are to be used in moderate risk situations; to provide a barrier to larger amounts of fluid penetration through splatter and more fluid exposure through soaking than Level 2; for use in Arterial blood draw, Inserting an IV, and Emergency Room Trauma. [6]

25.    The ANSI standard documents state the following:

In the United States, surgical apparel, surgical drapes, and drape accessories are medical devices and, under the Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of May 28, 1976, are subject to regulation by the U.S. Food and Drug Administration (FDA), including but not limited to FDA requirements for premarket notification (section 510(k) of the Act) and medical device reporting. Barrier efficacy has long been recognized as important in helping to prevent infections and is now mandated by Occupational Safety and Health Administration (OSHA) regulations limiting occupational exposure to bloodborne pathogens (29 CFR 1910.1030). See also the Centers for Disease Control and Prevention's (CDC's) Guideline for the prevention of surgical site infection (CDC, 1999; Mangram, et al., 1999).

Surgical gowns, other protective apparel, surgical drapes, and drape accessories are devices intended to promote infection control practices and help protect patients and health care workers. This standard is based on key barrier performance tests that are used to classify the subject products into levels of performance. Knowledge of these defined levels of performance will allow informed and consistent

---

[6] Id.

choices about the type of protective product necessary for the situation at hand.[7]

Health care personnel can be exposed to biological fluids capable of transmitting disease. Those diseases, which are caused by a variety of microorganisms, can pose significant risks to life and health. This is especially true of blood-borne pathogens such as the hepatitis B virus (HBV), hepatitis C virus (HCV), and human immunodeficiency virus (HIV). Patients can also be exposed to microorganisms and other contamination during surgical and other health care procedures. Because engineering controls cannot eliminate all possible exposures, attention is placed on the use of protective apparel, drapes, and drape accessories to reduce the potential for contact with blood, body fluids, OPIM, and microorganisms associated with these materials.

Health care workers wear protective apparel to help protect both the patient and themselves from the transfer of microorganisms by blood, body fluids, or OPIM. Drapes and drape accessories are also intended to inhibit the transfer of microorganisms and are used to isolate the surgical incision from microorganisms and other contamination.

The barrier performance of a level 3 gown is a critical safety feature and a requirement to prevent the spread of fluid born pathogens between medical provider and patient. The sole purpose of the level 3 gown is personal protection and safety, and the failure of a gown to provide the standard of protection it is

---

[7] ANSI/AAMIPB70:2012; Foreword.

8

designed to provide puts the wearer and patient at risk of contracting serious and/or fatal pathogens.

This standard addresses the barrier performance of surgical gowns, isolation gowns, other protective apparel, surgical drapes, and drape accessories designed to help preserve the sterile field and/or protect health care workers during surgery and other health care procedures in which exposure to blood, body fluids, and OPIM might be anticipated.[8]

26.     Specifically, the DLA conducted tests showing that the fabric supplied by Berry and Bonlam (and purchased through Textiles Shamen) did not meet the required levels of liquid permeability for Level 3 protection.

27.     On September 21, 2021, the DLA terminated the DLA Contract (the "Termination") for cause, for failing to supply the Product with materials in accordance with the specifications required by the DLA.

28.     On September 27, 2021, during TMT's investigation of the DLA's Termination, representatives from TMT and Defendants Berry and Bonlam engaged in detailed discussions regarding the Product failures (the "Berry Call"). During the Berry Call, representatives of Berry made several damning admissions. Specifically, representatives from Berry admitted that the raw materials supplied to Textiles Shamen were not capable of satisfying the requirements of Level 3 compliant Sterile Disposable Surgical Gowns. The Berry representatives explained that their original failures were caused by

---

[8] ANSI/AAMIPB70:2012; Appendix A.

9

faulty machinery which required a two-month plant closure for equipment cleaning and process redesign. Additionally, remedial measures taken to fix this problem occurred only after Berry supplied the defective fabric to Textiles Shamen for use of the Product. Berry's representatives stated that any additional fabric supplied and used by TMT would be a "totally different product," which was modified "in order to warranty the level required."

29.     The information gathered on the Berry Call clearly shows that Defendants Berry and Bonlam knowingly produced a defective product for use in surgical gowns that would be supplied to the U.S. Government.

30.     Furthermore, the defective Product impacted a number of TMT contracts, some of which were lost, cancelled, resulted in customer demands for refunds, and some of which TMT's customers stopped purchasing from TMT all together. Additionally, TMT made payments to Textiles Shamen for Products that TMT never received.

31.     Furthermore, because of the defective Product, TMT had to issue a recall for the Level 3 Gowns, which the FDA classified as a Class 2 Recall.

32.     TMT acted in accordance with the provisions of the agreements with Defendants and fulfilled its obligations. Defendants failed to fulfill their obligations pursuant to the provisions of the agreements causing TMT substantial damages.

33.     Despite TMT's demands for Defendants to reimburse TMT for the damages Defendants caused, Defendants have refused.

10

## Argument & Authorities

### A.    Breach of Implied Warranties

TMT alleged that, although Textiles Shamen was the intermediary, "Berry reached out to TMT on many occasions," including phone calls and emails "requesting . . . information related to the Product TMT needed." Dkt. 1 at 5. In fact, "[Berry] knew, before the manufacture of the materials, that the Product it would supply to Textiles Shamen, would be used in Texas by TMT to make gowns." Dkt. 1 at 5. But "the fabric supplied by Berry" was defective in that it "did not meet the required levels of liquid permeability for Level 3 protection." Dkt. 1 at 10. TMT contends, and the allegations in the Complaint show, that the fabric Berry supplied breached either the implied warranty of merchantability or the implied warranty of fitness for a particular purpose.

When a seller sells goods, the law imposes either of two implied warranties: the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. Tex. Bus. Com. Code §§ 2.314, 2.315. The two warranties are complimentary. The implied warranty of merchantability protects buyers from goods that are defective in one of six different ways, including goods that are not fit for their ordinary purpose and goods that are objectionable in the trade under the contract description. Tex. Bus. Com. Code § 2.314(b). The implied warranty of fitness for a particular purpose protects buyers when they buy goods for a particular purpose, relying on the seller's skill and judgment, with the seller having "reason to know any particular

purpose for which the goods are required." Tex. Bus. Com. Code § 2.315.

TMT sued Berry under both implied warranties. Berry challenges the claims on four grounds: (1) that Berry is an "upstream manufacturer" and therefore immune to liability for breach of implied warranties; (2) that there were no allegations that TMT's use of the fabric was in accordance with its "ordinary purpose"; (3) that there were no allegations that TMT's use of the fabric was an "unusual purpose"; and (4) that there were no allegations that TMT relied on Berry's expertise and guidance. All four arguments miss the mark.

1.    *TMT and Berry both expected Berry to resolve any issues with the fabric.*

Berry additionally argues that it is an "upstream manufacturer" and that upstream manufacturers are protected from implied warranties. But the Texas Supreme Court has specifically held, on my occasions, that a plaintiff *can* recover on an implied warranty claim against an upstream defendant. *See MAN Engines & Components Inc. v. Shows*, 434 S.W.3d 132, 137 (Tex. 2014) (holding that a purchaser of used goods can pursue a manufacturer for breach of implied warranty); *Nobility Homes of Texas Inc. v. Shivers*, 557 S.W.2d 77, 78 (Tex. 1977) (holding that a purchaser of new goods from an independent dealer can pursue a manufacturer for breach of implied warranty). The test for whether a buyer can pursue an "upstream manufacturer" does not turn on the number of steps between the buyer and the manufacturer, rather, it turns on

whether "the [buyer] had no expectation that [the manufacturer] would resolve any problem they might experience with the [end product]." *See Hininger v. Case Corp.*, 23 F.3d 124, 128 (5th Cir. 1994).

In the case at bar, TMT alleged that it had every expectation that Berry would resolve problems with the fabric:

> Prior to . . . manufacturing the Product, Berry reached out to TMT on many occasions. Berry sent numerous emails and set up phone and video calls with TMT requesting information to open an account with Berry and information related to the Product TMT needed . . . .

Dkt. 1 at 5. After TMT learned that Berry's fabric was defective,

> TMT and Defendants Berry and Bonlam engaged in detailed discussions regarding the Product failures (the "Berry Call"). During the Berry Call, . . . Berry admitted that the raw materials supplied to Textiles Shamen were not capable of satisfying the requirements of Level 3 compliant Sterile Disposable Surgical Gowns. The Berry representatives explained that their original failures were caused by faulty machinery . . . . Additionally, remedial measures taken to fix this problem occurred only after Berry supplied the defective fabric to Textiles Shamen for use of the Product. Berry's representatives stated that any additional fabric supplied and used by TMT would be a "totally different product," which was modified "in order to warranty the level required."

Dkt. 1 at 10-11.

In other words, TMT expected Berry to resolve any issues with the fabric because TMT had communicated with Berry directly regarding the fabric. And,

13

in fact, TMT did look to Berry to resolve the issues with the fabric. Thus, under the law, TMT can sue Berry for breach of implied warranties.

2. *Berry's fabric was not merchantable.*

Berry complains that there was no allegation in the Complaint that TMT's use of the fabric was its "ordinary purpose." However, the implied warranty of merchantability is broader than that. The implied warranty of merchantability protects buyers who think they are buying goods according to a certain description, but they are being supplied with goods that do not match that description. Tex. Bus. Com. Code § 2.314(b)(1). That is exactly the case here and what TMT's allegations show: TMT ordered fabric that would meet certain specifications of permeability, but "the fabric supplied by Berry" did not meet those specifications. As such, the fabric was objectionable in the trade, and Berry breached the implied warranty of merchantability.

3. *Berry may be liable whether TMT's use of Berry's fabric was in accordance with its ordinary purpose or an unusual purpose.*

Berry (a) challenges TMT's claim for breach of the implied warranty of merchantability on the basis that TMT's use was not in accordance with the fabric's ordinary purpose and (b) challenges TMT's claim for breach of the implied warranty of fitness for a particular purpose on the basis that TMT's use was not an unusual purpose. Berry cannot have it both ways. Using Berry's fabric in Level 3 Gowns was either the ordinary purpose of the fabric or it was an unusual purpose. If it was the ordinary purpose, then Berry is liable for

14

breach of the implied warranty of merchantability. If it was an unusual use, then Berry is liable for breach of the implied warranty of fitness of a particular purpose. Either way, Berry is liable for selling goods that were not fit for their purpose. At this stage in the case, TMT can allege both theories alternatively. *See* Fed. R. Civ. P. 8(d)(2).

4. *TMT relied on Berry's skill and judgment in supplying the particular fabric it needed.*

Berry argues that there was no allegation that TMT was relying on Berry's expertise in providing the fabric. However, the allegations show that TMT and Berry had many discussions about what exactly TMT needed, both before and after Berry provided defective fabric. Accordingly, the allegations therefore clearly show that TMT was relying on Berry's expertise to provide fabric that would meet its specifications.

## B. Negligence / Negligent Misrepresentation

1. *TMT properly alleged the elements of negligent misrepresentation.*

TMT asserted a claim for negligent misrepresentation against Berry. Specifically, TMT alleged that Berry provided information to TMT regarding the characteristics of the fabric (and Berry's ability to provide fabric that complied with TMT's specifications) without exercising reasonable care or competence in communicating that information. Dkt. 1 at 16. Specifically, TMT alleged that

> Prior to Berry and Bonlam manufacturing the Product, Berry reached out to TMT on many occasions. Berry sent numerous emails and set up phone and video calls with TMT requesting information to open an account with Berry and information related to the Product TMT needed to be sent to its Houston facility. Berry and Bonlam knew, before the manufacture of the materials, that the Product it would supply to Textiles Shamen, would be used in Texas by TMT to make gowns.

Dkt. 1 at 5. TMT relied on that information by using Berry's fabric to supply "hundreds of thousands of units" to the DLA. Dkt. 1 at 6. TMT's reliance on Berry's representations caused it to suffer damages, including the termination of the DLA Contract, cancellation of other contracts, and the issuance of a recall and refunds. Dkt. 1 at 11-12.

It appears from the allegations that Berry was negligent in communicating what went wrong as well:

> On September 27, 2021, during TMT's investigation of the DLA's Termination, representatives from TMT and Defendants Berry and Bonlam engaged in detailed discussions regarding the Product failures (the "Berry Call"). During the Berry Call, representatives of Berry made several damning admissions. Specifically, representatives from Berry admitted that the raw materials supplied to Textiles Shamen were not capable of satisfying the requirements of Level 3 compliant Sterile Disposable Surgical Gowns. The Berry representatives explained that their original failures were caused by faulty machinery which required a two-month plant closure for equipment cleaning and process redesign.

16

> Additionally, remedial measures taken to fix this problem occurred only after Berry supplied the defective fabric to Textiles Shamen for use of the Product. Berry's representatives stated that any additional fabric supplied and used by TMT would be a "totally different product," which was modified "in order to warranty the level required."

Dkt. 1 at 11.

Accordingly, TMT adequately alleged facts, with the particularity required by Rule 9(b), showing each of the essential elements of a claim for negligent misrepresentation.

## 2.  *The economic loss rule does not prevent TMT's recovery.*

Berry argues that the economic loss rule prohibits TMT's claim for negligent misrepresentation. While Texas courts apply the economic loss rule to claims for negligent misrepresentation, they allow a plaintiff to assert a claim for negligent misrepresentation if the plaintiff can show an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim. *D.S.A. Inc. v. Hillsboro I.S.D.*, 973 S.W.2d 662, 664 (Tex. 1998). Those damages include "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." *Sterling Chemicals Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797-98 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (quoting Restatement (Second) of Torts § 552B (1977)).

Here, TMT alleged that, as a consequence of relying on Berry's

misrepresentations, it "supplied hundreds of thousands of" Level 3 Gowns with Berry's fabric "to the DLA." Dkt. 1 at 6. As a consequence of TMT's reliance on Berry's misinformation, the DLA Contract was cancelled, and "a number of TMT contracts . . . were lost, cancelled, [or] resulted in customer demands for refunds" and "some of . . . TMT's customers stopped purchasing from TMT all together." Dkt. 1 at 11. TMT seeks to recover these damages, some of which are independent of the benefit of its bargain with Textiles Shamen. Accordingly, while the economic loss rule may limit some of TMT's damages recoverable for negligent misrepresentation, it does not bar the claim entirely.

3.    *Berry's partial disclosures imposed a duty to disclose.*

Berry argues that it had no duty to disclose. This argument, however, completely ignores the allegations that Berry made partial representations that prompted its duty to make full disclosure. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings LLC*, 572 S.W.3d 213, 220 (Tex. 2019). Specifically, TMT alleged that Berry made representations regarding its ability to produce fabric that would satisfy TMT's requirements. Dkt. 1 at 5. That representation was false. Either Berry knew it was false at the time it was made, prompting a duty to disclose the whole truth, or Berry learned later that it was false, prompting a duty to correct the prior misrepresentation.

Accordingly, TMT's claim for negligent misrepresentation survives.

### C.   Fraud / Fraudulent Inducement

TMT alleged that Berry is liable for fraud and fraudulent inducement because Berry (and Textiles Shamen) made representations about the fabric, specifically that it would and did comply with certain specifications; that TMT relied on those representations; and that, as a result of TMT's reliance, it suffered damages, including money paid to Textiles Shamen and consequential damages from the termination or cancellation of other contracts. Dkt. 1 at 5, 16. Berry challenges the claim on four grounds: particularity under Rule 9(b), the lack of a contract between TMT and Berry, the economic loss rule, and a claim that there was no pleading of out-of-pocket damages.

First, Berry's argument ignores TMT's allegations. TMT alleged that Berry's representatives made representations about its ability to make fabric that met certain specifications in emails, phone calls, and video calls prior to manufacturing the fabric. Dkt. 1 at 5. TMT alleged that it relied on Berry's representations and "supplied hundreds of thousands of units" to the DLA. Dkt. 1 at 6. TMT alleged that those representations were false because "the fabric supplied by Berry . . . did not meet the required levels of liquid permeability." Dkt. 1 at 10. And TMT alleged that, as a result of Berry's false representations, TMT suffered damages, including but not limited to contracts that were lost or cancelled, refunds that were demanded, customers that were lost all together, and "payments to Textiles Shamen for Products that TMT never received." Dkt. 1 at 11. Thus, TMT's allegation of fraud satisfies the

19

particularity requirements of Rule 9(b) and alleges out-of-pocket damages.

Second, as set forth below in Section D., TMT was a third-party beneficiary of the contract between Textiles Shamen and Berry. Thus, a contract does exist where TMT can lawfully enforce and therefore may recover for fraudulent inducement.

Third, the economic loss rule does not apply to fraud claims. *See Sharyland Water Supply v. City of Alton*, 354 S.W.3d 407, 417-19 (Tex. 2011) (citing *Formosa Plastics Corp. USA v. Presidio Engineers & Contracting Inc.*, 960 S.W.2d 41, 46-47 (Tex. 1998); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983)).

And fourth, TMT pleaded that it paid for Berry's fabric in reliance on Berry's representations. Dkt. 1 at 5–6, 11–12. TMT therefore pleaded out-of-pocket damages.

## D.    Breach of Contract

TMT alleged that it had a contract to supply Level 3 Gowns to the DLA; that, pursuant to that contract, it contracted with Textiles Shamen to provide certain components of the Level 3 Gowns; and that Textiles Shamen then contracted with Berry to provide fabric. Dkt. 1 at 4-5. As part of performing its contract with Textiles Shamen, Berry:

> reached out to TMT on many occasions. Berry sent numerous emails and set up phone and video calls with TMT requesting information to open an account with Berry and information related to the Product

> TMT needed to be sent to its Houston facility. Berry
> and Bonlam knew, before the manufacture of the
> materials, that the Product it would supply to Textiles
> Shamen, would be used in Texas by TMT to make
> gowns.

Dkt. 1 at 5. TMT later learned "that the fabric supplied by Berry and Bonlam
(and purchased through Textiles Shamen) did not meet the required levels of
permeability for Level 3 protection." Dkt. 1 at 10. As a result of Berry's breach,
TMT lost the DLA contract and suffered other consequential damages,
including other contracts that were lost or cancelled, refunds that had to be
issued, and customers lost entirely. Dkt. 1 at 10. Berry challenges TMT's
statement of its claim on four grounds, none of which passes muster.

Berry claims that it was not a party to the contract between TMT and
Textiles Shamen. That is true, but immaterial. Berry and Textiles Shamen
entered into a contract "To supply TMT with the necessary Level 3 compliant
materials." Dkt. 1 at 5. They entered into that contract directly and specifically
to benefit TMT. The allegations show that TMT was aware of the contract and
its intended benefit, which TMT detrimentally relied upon and sued to enforce.
Consequently, TMT is a third party beneficiary of that contract and has
standing to sue to enforce it. *See West Loop Hospitality LLC v. Houston
Galleria Lodging Associates LLC*, 649 S.W.3d 461, 481-83 (Tex. App.—Houston
[1st Dist.] 2022, pet. denied).

TMT's third-party beneficiary status negates Berry's other three
arguments. First, as a third-party beneficiary of the contract between Berry

and Textiles Shamen, there is no requirement that consideration flow to or from TMT. Second, the allegations show that there was a written contract between Textiles Shamen and Berry, so the statute of frauds does not bar enforcement of that contract. Third, the allegations show that Berry promised to provide fabric of a certain quality to Textiles Shamen and that it failed to do so—that is, that Berry breached its contract—causing TMT to suffer damages.

Berry argues in its motion that there are no allegations of breach. Specifically, Berry argues: (1) that there were no allegations that Berry's fabric failed to comply with promised specifications, (2) that TMT's damages are "tied to the specification," and (3) that Berry's fabric was defective at the time of delivery. Berry's Motion at 13–15. But Berry's arguments ignore the allegations made. As set forth above, TMT alleged: that "Berry reached out to TMT on many occasions" to discuss the purpose and specifications of the fabric (¶ 18); that "the fabric supplied by Berry . . . did not meet the required levels of liquid permeability for Level 3 protection" (¶ 26)[9]; and that Berry's fabric failed to meet those specifications because of "faulty machinery which required a two-month plant closure for equipment cleaning and process redesign" (¶ 28). And TMT alleged that Berry's defective fabric rendered the gowns (the "Product") defective, so "the DLA terminated the DLA Contract . . . for cause, for failing to supply the Product with materials in accordance with the

_____

[9] Berry admitted that a "fabric specification [] makes sense," but apparently failed to note paragraph 26's allegations that Berry's fabric failed to meet the fabric specification.

specifications required by the DLA" (¶ 27). Put more succinctly: Berry knew the fabric specification but still used faulty machinery to produce defective fabric. That defective fabric directly led to the termination of the DLA Contract and all of TMT's claimed damages.

Accordingly, TMT has stated a plausible claim for breach of contract against Berry.

## E.   DTPA

TMT concedes that the large transaction exemption in Tex. Bus. Com. Code § 17.49(g) applies to this case. With leave of Court, TMT will amend its complaint to dismiss its DTPA claims.

## F.   Intention to Amend

The majority of Berry's arguments go to issues that can be corrected by amendment rather than legal issues that cannot be corrected by amendment. TMT intends, with the Court's leave, to amend the complaint to address and correct all such issues.

## Conclusion and Prayer

The Court should deny Berry's motion to dismiss because TMT's complaint stated plausible claims against Berry for breach of the implied warranties of merchantability or fitness for a particular purpose, for negligent misrepresentation, for fraud and fraudulent inducement, and for breach of contract. Additionally, TMT intends to amend the complaint to dismiss the

DTPA claim and to address any other deficiencies found by the Court. TMT asks for this and such other and further relief to which it may be entitled.

Respectfully submitted,


*/s/ James Ardoin*
JAMES ARDOIN
State Bar No. 24045420
Email: jimmy@jimmyardoinlaw.com
JIMMY ARDOIN & ASSOCIATES PLLC
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
P: (713) 574-8900
F: (713) 574-1404

GEORGE J. HITTNER
State Bar No. 24038959
S.D. TX No. 431901
Email: george@thehittnergroup.com
**The Hittner Group, PLLC**
P.O. Box 541189
Houston, Texas 77254
Phone: (713) 505-1003

Jeremy M. Masten
Texas Bar No. 24083454
jeremy@themastenlawfirm.com
P.O. Box 541411
Houston, Texas 77254
(254) 307-9185

THE SHEENA LAW FIRM
Danny M. Sheena, P.E.
Texas Bar No. 00792830
Jason P. Scofield
Texas Bar No. 24060578
Megan Sheena
Texas Bar No. 24132004

24

2500 W. Loop South, Suite 518
Houston, Texas 77027
(713) 224-6508 – tel
(713) 225-1560 – fax
service@sheenalawfirm.com

*Counsel for Plaintiff*

## Certificate of Service

I certify that on September 7, 2023, the foregoing instrument was served on all parties through their counsel of record, including those listed below, through the Court's CM/ECF system.

| Berry Global Inc. Bonlam, S.A. de C.V. | Brice A. Wilkinson |
|---|---|

*/s/ James Ardoin*
James Ardoin