In the United States District Court
Southern District of Texas
Houston Division

| | | |
|---|---|---|
| Texas Medical Technology Inc. f/k/a Texas Medical Center Supply LLC<br>    Plaintiff<br><br>v.<br><br>Berry Global Inc.<br>Bonlam, S.A. de C.V.<br>Textiles Shamen Texas LLC<br>Textiles Shamen, S.A. de C.V.<br>Shlomo Mizrahi<br>Eliran Segal<br>    Defendants | § § § § § § § § § § § § § § | Cause No. 4:23-cv-01537<br><br><br>Jury Demanded. |

## Plaintiff's First Amended Complaint

Plaintiff had a contract to provide the United States Government with Level 3 medical gowns. Defendants promised and represented to Plaintiff that they could provide fabric to Plaintiff for use in manufacturing those gowns. They could not, and they did not. But Plaintiff did not find out until the Government terminated the contract for noncompliance with materials regulations. Plaintiff therefore files this complaint, seeking compensation for the harm caused by Defendants' misrepresentations and broken promises.

## Jurisdiction and Venue

1.   This Court has personal jurisdiction over Defendants because they conduct substantial business in Texas and a substantial part of the events or

omissions giving rise to Plaintiffs' claims occurred in Texas.

2.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## Parties

4.  Plaintiff Texas Medical Technology, Inc. f/k/a Texas Medical Center Supply, LLC, is a Texas corporation with its principal place of business in Harris County, Texas.

5.  Defendant, Berry Global Inc., is a Delaware corporation with its principal place of business in Evansville, Indiana. This defendant has appeared and answered and may be served through its counsel of record.

6.  Defendant, Bonlam, S.A. de C.V. is Mexican company doing business in Harris County, Texas. Defendant Bonlam is a subsidiary of Defendant Berry Global Inc. who is a manufacturer and provided the defective material made the basis of this lawsuit. Defendant Bonlam has appeared and answered and may be served through its counsel of record.

7.  Defendant, Textiles Shamen Texas, LLC, is a limited liability company formed under Texas law. All its members are citizens of the United

Mexican States. This defendant may be served via its registered agent for service of process: CT Corporation System, 1999 Bryan St #900, Dallas, Texas 75201-3136, or wherever they may be found.

8. Defendant, Textiles Shamen, S.A. de C.V., is a Mexican company doing business in Harris County, Texas, and may be served at Carretera Naucalpan Jilotzingo Ixtlahuaca, No. 1225, Local 1, Sección 4, Col. Santiago Tepatlaxco, Naucalpan de Juarez, Estado de México, C.P. 53216, or wherever they may be found.

9. Defendant, Eliran Segal, is an individual citizen of Mexico and owner/officer of Defendant Textiles Shamen, S.A. de C.V. and Textiles Shamen Texas, LLC, who may be served with citation at Socrates 306 PB, Polanco II Seccion 11530, Miguel Hidalgo, CDMX, Mexico, or wherever he may be found.

10. Defendant, Shlomo Mizrahi, is an individual citizen of Mexico and owner/officer of Textiles Shamen, S.A. de C.V. and Textiles Shamen Texas, LLC, who may be served with citation at Socrates 222 PH, Polanco II Sección 11530, Miguel Hidalgo, CDMX, Mexico, or wherever he may be found.

## Factual Background

11. This case stems from Defendants' failure to provide Level 3 compliant materials to Plaintiff, causing Plaintiff to sustain substantial damages.

12. Plaintiff Texas Medical Technology Inc. f/k/a Texas Medical Center Supply LLC ("TMT") is a medical equipment supply company based in

Houston, Texas. TMT manufactures, supplies and distributes medical safety equipment including personal protective equipment, such as facemasks, vinyl, latex, nitrile gloves, patient gowns, lab coats, and hand sanitizers. Due to the nature of the equipment, their intended uses are part and parcel to safety.

13. The DLA[1] is the agency responsible for procurement for the United Stated armed forces and related agencies. The DLA entered contract SPE1C1-21-D-1421 (the "DLA Contract") with an entity called At Ease Sustainment, LLC for the procurement of level 3 surgical gowns ("Level 3 Gowns").[2]

14. TMT was approved as the sole manufacturer of Level 3 Gowns to be supplied to the U.S. Government under the DLA Contract in 2020. As the sole manufacturer under the DLA Contract, TMT stood to earn profits in the tens of millions of dollars.

15. Following TMT's designation, TMT communicated with Defendants Shlomo Mizrahi and Eliran Segal, as representatives of Defendant Textiles Shamen, S.A. de C.V. ("Textiles Shamen"), and entered into a supply contract. Pursuant to the supply contract, Textiles Shamen was to supply TMT with various materials necessary for the manufacture of Level 3 Gowns ("TS Supply Contract").

16. Under the terms of the TS Supply Contract, Textiles Shamen represented and warranted that it "must act with the highest standards of

---

[1] The Defense Logistics Agency.
[2] https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns.

quality and professionalism in the delivery of the PRODUCT, in accordance with this Contract." Additionally, Textiles Shamen represented and warranted that the Product supplied "must fulfil all technical specifications for the PRODUCT, as well as with the specifications for its individual packaging." TMT relied on these representations and warranties to fulfill its business obligations with third parties, such as the DLA.

17. To supply TMT with the necessary Level 3 compliant materials, Textiles Shamen contracted with Defendants Berry Global Inc. and Bonlam, S.A. de C.V. for the purchase of fabric, which Textiles Shamen then sold to TMT (the "Product"). Berry and Bonlam knew the fabric was purchased for the benefit of TMT, and, upon information and belief, TMT was identified in the documentation that comprises the contract between Textiles Shamen and Berry and Bonlam. In other words, Berry and Bonlam sold fabric to Textiles Shamen for the purpose of being resold to TMT.

18. Prior to Berry and Bonlam manufacturing the Product, Berry reached out to TMT on many occasions. Berry sent numerous emails and set up phone and video calls with TMT requesting information to open an account with Berry and information related to the Product TMT needed to be sent to its Houston facility. Berry and Bonlam knew, before the manufacture of the materials, that the Product it would supply to Textiles Shamen, would be used in Texas by TMT to make gowns. Berry and Bonlam also knew that TMT would look to them to correct or address any issues with Berry and Bonlam's fabric.

5

19.    Furthermore, Segal and Mizrahi formed Textiles Shamen Texas, LLC to manage the manufacturing of the Level 3 Gowns in Houston. Segal and Mizrahi were to check the quality of the Product at the Textiles Shamen facility, send the Product to additional testing, and manage operations at TMT's Houston facility.

20.    Additionally, Segal and Mizrahi, as individuals, entered into an operating agreement with TMT, where Segal and Mizrahi agreed to be responsible for all day-to-day operations of the manufacturing of the gowns.

21.    Between February 2021 and April 2021, Segal and Mizrahi flew to Houston almost every two weeks and stayed in the TMT facility for many days at a time to ensure the quality of the Product and correct assembly of the gowns. While at the TMT Houston facility, Segal and Mizrahi also gave direct orders to personnel on how to assemble the gowns faster, how to move from different stages in the assembly line, and how the product should be packaged. Segal and Mizrahi represented to TMT that they had been conducting this type of quality control for over 30 years and have both the experience and knowledge to advise TMT on the manufacturing process.

22.    TMT supplied hundreds of thousands of units of the Product to the DLA.

23.    In April 2021, prior to using the Product, the DLA informed At Ease and TMT that the Products failed to meet the requisite criteria for Level 3 Gowns.

24. Pursuant to the FDA:

> Gowns are examples of personal protective equipment used in health care settings. They are used to protect the wearer from the spread of infection or illness if the wearer comes in contact with potentially infectious liquid and solid material. They may also be used to help prevent the gown wearer from transferring microorganisms that could harm vulnerable patients, such as those with weakened immune systems. Gowns are one part of an overall infection-control strategy.
>
> A few of the many terms that have been used to refer to gowns intended for use in health care settings, include surgical gowns, isolation gowns, surgical isolation gowns, nonsurgical gowns, procedural gowns, and operating room gowns. In 2004, the FDA recognized the consensus standard American National Standards Institute/Association of the Advancement of Medical Instrumentation (ANSI/AAMI) PB70:2003, "Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities."
>
> New terminology in the standard describes the barrier protection levels of gowns and other protective apparel intended for use in health care facilities and specifies test methods and performance results necessary to verify and validate that the gown provides the newly defined levels of protection:
>
>> **Level 1:** Minimal risk, to be used, for example, during basic care, standard isolation, cover gown for visitors, or in a standard medical unit

> **Level 2:** Low risk, to be used, for example, during blood draw, suturing, in the Intensive Care Unit (ICU), or a pathology lab
>
> **Level 3:** Moderate risk, to be used, for example, during arterial blood draw, inserting an Intravenous (IV) line, in the Emergency Room, or for trauma cases

A surgical gown is a personal protective garment intended to be worn by health care personnel during surgical procedures to protect both the patient and health care personnel from the transfer of microorganisms, body fluids, and particulate matter.[3]

The level 3 ANSI/AAMI designation means that the surgical gowns are to be used in moderate risk situations; to provide a barrier to larger amounts of fluid penetration through splatter and more fluid exposure through soaking than Level 2; for use in Arterial blood draw, Inserting an IV, and Emergency Room Trauma. [4]

25. The ANSI standard documents state the following:

> In the United States, surgical apparel, surgical drapes, and drape accessories are medical devices and, under the Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of May 28, 1976, are subject to regulation by the U.S. Food and Drug Administration (FDA), including but not limited to FDA requirements for premarket notification (section 510(k) of the Act) and medical device reporting. Barrier efficacy has long been recognized as important

---

[3] https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns

[4] Id.

8

in helping to prevent infections and is now mandated by Occupational Safety and Health Administration (OSHA) regulations limiting occupational exposure to bloodborne pathogens (29 CFR 1910.1030). See also the Centers for Disease Control and Prevention's (CDC's) Guideline for the prevention of surgical site infection (CDC, 1999; Mangram, et al., 1999).

Surgical gowns, other protective apparel, surgical drapes, and drape accessories are devices intended to promote infection control practices and help protect patients and health care workers. This standard is based on key barrier performance tests that are used to classify the subject products into levels of performance. Knowledge of these defined levels of performance will allow informed and consistent choices about the type of protective product necessary for the situation at hand.[5]

Health care personnel can be exposed to biological fluids capable of transmitting disease. Those diseases, which are caused by a variety of microorganisms, can pose significant risks to life and health. This is especially true of blood-borne pathogens such as the hepatitis B virus (HBV), hepatitis C virus (HCV), and human immunodeficiency virus (HIV). Patients can also be exposed to microorganisms and other contamination during surgical and other health care procedures. Because engineering controls cannot eliminate all possible exposures, attention is placed on the use of protective apparel, drapes, and drape accessories to reduce the potential for contact with blood, body fluids, OPIM, and microorganisms associated with these materials.

---

[5] ANSI/AAMIPB70:2012; Foreword

> Health care workers wear protective apparel to help protect both the patient and themselves from the transfer of microorganisms by blood, body fluids, or OPIM. Drapes and drape accessories are also intended to inhibit the transfer of microorganisms and are used to isolate the surgical incision from microorganisms and other contamination.
>
> The barrier performance of a level 3 gown is a critical safety feature and a requirement to prevent the spread of fluid born pathogens between medical provider and patient. The sole purpose of the level 3 gown is personal protection and safety, and the failure of a gown to provide the standard of protection it is designed to provide puts the wearer and patient at risk of contracting serious and/or fatal pathogens.
>
> This standard addresses the barrier performance of surgical gowns, isolation gowns, other protective apparel, surgical drapes, and drape accessories designed to help preserve the sterile field and/or protect health care workers during surgery and other health care procedures in which exposure to blood, body fluids, and OPIM might be anticipated.[6]

26. Specifically, the DLA conducted tests showing that the fabric supplied by Berry and Bonlam (and purchased through Textiles Shamen) did not meet the required levels of liquid permeability for Level 3 protection.

27. On September 21, 2021, the DLA terminated the DLA Contract (the "Termination") for cause, for failing to supply the Product with materials in accordance with the specifications required by the DLA.

---

[6] ANSI/AAMIPB70:2012; Appendix A

28.     On September 27, 2021, during TMT's investigation of the DLA's Termination, representatives from TMT and Defendants Berry and Bonlam engaged in detailed discussions regarding the Product failures (the "Berry Call"). During the Berry Call, representatives of Berry made several damning admissions. Specifically, representatives from Berry admitted that the raw materials supplied to Textiles Shamen were not capable of satisfying the requirements of Level 3 compliant Sterile Disposable Surgical Gowns. The Berry representatives explained that their original failures were caused by faulty machinery which required a two-month plant closure for equipment cleaning and process redesign. Additionally, remedial measures taken to fix this problem occurred only after Berry supplied the defective fabric to Textiles Shamen for use of the Product. Berry's representatives stated that any additional fabric supplied and used by TMT would be a "totally different product," which was modified "in order to warranty the level required."

29.     The information gathered on the Berry Call clearly shows that Defendants Berry and Bonlam knowingly produced a defective product for use in surgical gowns that would be supplied to the U.S. Government.

30.     Furthermore, the defective Product impacted a number of TMT contracts, some of which were lost, cancelled, resulted in customer demands for refunds, and some of which TMT's customers stopped purchasing from TMT all together.

31.     Additionally, TMT made payments to Textiles Shamen for

Products that TMT never received.

32. Furthermore, because of the defective Product, TMT had to issue a recall for the Level 3 Gowns, which the FDA classified as a Class 2 Recall.

33. TMT acted in accordance with the provisions of the agreements with Defendants and fulfilled its obligations. Defendants failed to fulfill their obligations pursuant to the provisions of the agreements causing TMT substantial damages.

34. Despite TMT's demands for Defendants to reimburse TMT for the damages Defendants caused, Defendants have refused.

## Causes of Action

### A. Breach of Contract by All Defendants

35. Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

36. TMT and Textiles Shamen entered into the TS Supply Contract, a valid, written, and enforceable supply contract. Under the TS Supply Contract, Textiles Shamen was obligated to supply TMT with Level 3 compliant materials.

37. However, Textiles Shamen provided TMT with defective materials, which were not Level 3 compliant, effectively breaching the TS Supply Contract. As a result of Textiles Shamen's breach, TMT incurred, and continues to incur, substantial damages.

38. Furthermore, Textiles Shamen contracted with Berry and Bonlam

to provide Level 3 gown materials in full compliance with the required specification for the benefit of TMT. Upon information and belief, the contract between Textiles Shamen and Berry and Bonlam specifically identified TMT as a third-party beneficiary. TMT had numerous communications with Berry and Bonlam regarding Level 3 material specifications. Berry and Bonlam agreed to provide the Level 3 gown material in full compliance with the required specification.

39. Berry and Bonlam provided Textiles Shamen, and therefore TMT, with defective materials, which were not Level 3 compliant. Berry and Bonlam's failure breached its contract with Textiles Shamen. As a result of Berry and Bonlam's breach, TMT incurred, and continues to incur, substantial damages. Berry and Bonlam is liable to TMT for those damages because TMT is a third-party beneficiary of the contract between Textiles Shamen and Berry and Bonlam.

40. Additionally, Textiles Shamen Texas agreed to oversee quality control of the Level 3 Product. Mizrahi and Segal were representatives of Textiles Shamen Texas. Textiles Shamen Texas failed to perform its obligation as agreed. As a result of Textiles Shamen Texas's breach, TMT incurred, and continues to incur, substantial damages.

B. **Breach of Express Warranty by Textiles Shamen and Mizrahi**

41. Plaintiff re-alleges and incorporates by reference the preceding

paragraphs for all purposes as if set forth fully herein.

42. Pursuant to the TS Supply Contract, Textiles Shamen promised and/or affirmed to TMT that the Product provided to TMT would be Level 3 compliant. Specifically, Textiles Shamen represented and warranted that Textiles Shamen "must act with the highest standards of quality and professionalism in the delivery of the PRODUCT, in accordance with this Contract." Additionally, Textiles Shamen represented and warranted that Textiles Shamen "must fulfil all technical specifications for the PRODUCT, as well as with the specifications for its individual packaging."

43. Furthermore, the TS Supply Contract provides that "SHLOMO SEGAL MIZRAHI, declares that he has sufficient powers to represent and subscribe this contract." Thus, the representations and warranties in the TS Supply Contract are expressly those of Defendant Mizrahi (an owner of Textiles Shamen) as well.

44. TMT relied on these representations and warranties to fulfill its business obligations to third parties.

45. However, the Product provided to TMT was defective and failed to fulfill the technical specifications for Level 3 materials.

46. Thus, the Product failed to comply with the promises and/or affirmations made to TMT. As a result, TMT sustained substantial financial injuries.

## C. Breach of Implied Warranties by Textiles Shamen, Berry, and Bonlam

47. TMT re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

48. Defendants sold TMT defective Products that were not Level 3 compliant, and use of such defective Product exposes the user to harm in Level 3 situations.

49. TMT used the Product supplied by Textiles Shamen, Berry, and Bonlam for its ordinary purpose. But the Product was not fit for that ordinary purpose. Additionally, the Product was objectionable in the trade under the contract description. Accordingly, Textiles Shamen, Berry, and Bonlam each breached the implied warranty of merchantability and are liable to TMT.

50. Alternatively, TMT used the Product supplied by Textiles Shamen, Berry, and Bonlam for a particular purpose. In purchasing the Product, TMT relied on the skill and judgment of Textiles Shamen, Berry, and/or Bonlam. Textiles Shamen, Berry, and Bonlam each separately had reason to know any particular purpose for which fabric was are required, including but not limited to various phone calls and other communications among the parties. Defendants knew that TMT was the sole supplier of personal protective equipment ("PPE") under a contract. At the time of contracting, Defendants knew that the goods were for a particular purpose because they represented that the goods could fulfill TMT's business needs regarding that particular purpose and the requirements to which TMT was obligated to adhere. TMT

15

relied on Defendants' skill and judgment to select goods for that purpose. Nevertheless, Textiles Shamen, Berry, and Bonlam provided Product that was not fit for that particular purpose. Indeed, the Product was unreasonably dangerous to users.

51. TMT notified Defendants of the issues and subsequently suffered injury to its business.

52. As such, Defendants Textiles Shamen, Berry, and Bonlam each breached their implied warranties of fitness for a particular purpose.

### D. Unjust Enrichment/Money Had and Received by Textiles Shamen, Mizrahi, and Segal

53. TMT re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

54. TMT made payments to Textiles Shamen pursuant to the terms of the TS Supply Contract.  Textiles Shamen failed to perform its contractual obligations. Despite TMT's demands for a refund, Textiles Shamen is wrongfully withholding money belonging to TMT.

55. As a result of Textiles Shamen's conduct, TMT has incurred substantial damages including, but not limited to, the loss of contracts.

56. Textiles Shamen has enjoyed unjust enrichment at the expense of TMT as a result of Textiles Shamen's failure to perform its supply obligations as agreed and failure to provide the Product in compliance with the specifications provided.

### E. Conversion by Textiles Shamen.

57. Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

58. TMT made payments to Textiles Shamen for products it never received. Textiles Shamen is wrongfully exercising dominion and control over TMT's funds. Without legal justification or excuse, Textiles Shamen converted rights and benefits of the funds to itself, depriving TMT of the rights and benefits flowing from TMT's possession of the funds. TMT is entitled to exclusive use and possession of the funds transferred to TS.

## Damages

59. TMT re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

60. TMT seeks the following damages as result of Defendants' misconduct:

   a. Actual damages, including the direct, foreseeable and consequential damages of Defendants' wrongful actions;

   b. Pre-judgment and post-judgment interest at the maximum non-usurious rate;

   c. Court costs;

   d. Attorney's fees, and

   e. Such other relief to which Plaintiff may be entitled in law or equity.

## Attorney's Fees

61. Plaintiff is entitled to recover its attorney's fees under the contract,

17

Chapter 38 of the Texas Civil Practice & Remedies Code, and other law.

## Conditions Precedent

62. All conditions precedent to Plaintiff's recovery and claims have been performed or have occurred.

## Jury Demand

63. Plaintiff demands a jury trial for all causes of action for which they have a right to jury trial.

## Conclusion and Prayer

WHEREFORE, Premises considered, Plaintiff Texas Medical Technology, Inc. f/k/a Texas Medical Center Supply, LLC, prays that Defendants Berry Global, Inc., Bonlam, S.A. de C.V., Textiles Shamen Texas LLC, Textiles Shamen, S.A. de C.V., Eliran Segal, and Shlomo Mizrahi, be cited to appear and answer, and that Plaintiff be awarded a judgment against Defendants for damages as set forth above, and for all other relief to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ James Ardoin*
JAMES ARDOIN
State Bar No. 24045420
Email: jimmy@jimmyardoinlaw.com
JIMMY ARDOIN & ASSOCIATES PLLC
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
P: (713) 574-8900
F: (713) 574-1404

GEORGE J. HITTNER
State Bar No. 24038959
S.D. TX No. 431901
Email: george@thehittnergroup.com
**The Hittner Group, PLLC**
P.O. Box 541189
Houston, Texas 77254
Phone: (713) 505-1003

JEREMY M. MASTEN
Texas Bar No. 24083454
jeremy@themastenlawfirm.com
P.O. Box 541411
Houston, Texas 77254
(254) 307-9185

THE SHEENA LAW FIRM
Danny M. Sheena, P.E.
Texas Bar No. 00792830
Jason P. Scofield
Texas Bar No. 24060578
Megan Sheena
Texas Bar No. 24132004
2500 W. Loop South, Suite 518
Houston, Texas 77027
(713) 224-6508 – tel
(713) 225-1560 – fax
service@sheenalawfirm.com

*Counsel for Plaintiff*

## Certificate of Service

I certify that a true and correct copy of the foregoing was served on all parties and their counsel of record through the Court's CM/ECF system on January 5, 2024, including those listed below.

- Brice A. Wilkinson for Berry Global Inc. and Bonlam S.A. de C.V.

*/s/ James Ardoin*
James Ardoin