In the United States District Court
Southern District of Texas
Houston Division

| | | |
|---|---|---|
| Texas Medical Technology Inc. | § | |
| f/k/a Texas Medical Center Supply | § | |
| LLC | § | |
|     Plaintiff | § | Cause No. 4:23-cv-01537 |
| | § | |
| v. | § | |
| | § | |
| Berry Global Inc. | § | |
| Bonlam, S.A. de C.V. | § | Jury Demanded. |
| Textiles Shamen Texas LLC | § | |
| Textiles Shamen, S.A. de C.V. | § | |
| Shlomo Mizrahi | § | |
| Eliran Segal | § | |
|     Defendants | § | |

---

## Plaintiff's Response to Berry and Bonlam's Rule 12(b)(6) Motion to Dismiss (Dkt. 37)

---

# Table of Contents

Table of Contents ..................................................................................ii

Table of Authorities ............................................................................iii

Introduction...........................................................................................1

Standard of Review ..............................................................................2

Plaintiff's Allegations...........................................................................2

Arguments & Authorities ...................................................................11

A. Third-Party Beneficiary Claims ...................................................11

B. Breach of Implied Warranties ......................................................13

    1.  Legal Context. .........................................................................13

    2.  TMT's allegations......................................................................15

    3.  Berry breached the implied warranty of merchantability.....................17

    4.  Berry breached the implied warranty of fitness for a particular purpose. .........................................................................19

    5.  *Hininger* does not immunize Berry........................................20

    6.  Conclusion .............................................................................22

Prayer ..................................................................................................22

Certificate of Service...........................................................................24

# Table of Authorities

*Cases*

*ASAI v. Vanco Insulation Abatement, Inc.*, 932 S.W. 2d 118 (Tex. App.—El Paso 1996, no writ) .......................................................................... 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................. 2

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)........................................ 2

*Bob Davis Paint & Drywall Inc. v. Valspar Corp.*, 452 F. Supp. 3d 589 (S.D. Tex. 2020) ...................................................................................... 14–15

*Coghlan v. Aquasport Marine Corp.*, 75 F. Supp. 2d 769 (S.D. Tex. Oct. 8, 1999) ..................................................................................................... 14, 19

*Hininger v. Case Corp.*, 23 F.3d 124 (5th Cir. 1994) ................................. 18, 20

*MAN Engines & Components Inc. v. Shows*, 434 S.W.3d 132 (Tex. 2014)...... 20

*Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137 (5th Cir. 2007) ..................................................................................................................... 2

*Nobility Homes of Texas Inc. v. Shivers*, 557 S.W.2d 77 (Tex. 1977) ............. 20

*Sysco Merchandising & Supply Chain Services Inc. v. Remcoda LLC*, No. 4:22-cv-02075 (S.D. Tex. Feb. 6, 2023) ...................................................... 15

*West Loop Hospitality LLC v. Houston  Galleria Lodging Assocs. LLC*, 649 S.W.3d 461 (Tex. App.—Houston [1st Dist.] 2022, pet. denied)......... 12–13


*Statutes and Rules*

Fed. R. Civ. P. 8............................................................................................... 15

Fed. R. Civ. P. 12................................................................................. *passim*

Tex. Bus. Com. Code § 2.314 ....................................................... 13–14, 17–18

Tex. Bus. Com. Code § 2.315 ............................................................. 13–14, 19

TMT is opposed to Berry and Bonlam's motion to dismiss because TMT's Complaint stated plausible claims against Berry and Bonlam.

## Introduction

Berry, in consultation with Textiles Shamen and TMT,[1] agreed to manufacture fabric that Textiles Shamen would sell to TMT, who would use the fabric to make Level 3 Gowns for sale to the federal government. The fabric of a Level 3 Gown must meet certain specifications. Berry knew why Textiles Shamen ordered the fabric, knew why TMT needed the fabric, and knew what the specifications were for the fabric of Level 3 Gowns. And yet Berry produced defective fabric that caused TMT to provide defective Level 3 Gowns, resulting in a recall and millions of dollars of damages to TMT.

Consequently, TMT sued Berry and Textiles Shamen. Dkt. 1. Berry responded first, filing a motion to dismiss under Rule 12(b)(6). Dkt. 20. After the Court ruled on that motion, TMT filed its First Amended Complaint. Dkt. 31. Berry again filed a motion to dismiss. Dkt. 37. In its second motion, Berry challenged TMT's third-party beneficiary and implied warranty claims. After Berry filed its second motion, the parties engaged in an informal exchange of information. After that exchange, TMT has learned that its third-party beneficiary claims cannot survive under Texas law, albeit for reasons

---

[1] "Berry" refers collectively to Defendants Berry Global Inc. and Bonlam, S.A. de C.V. "Textiles Shamen" refers collectively to Defendants Textiles Shamen Texas LLC and Textiles Shamen, S.A. de C.V. "TMT" refers to Plaintiff Texas Medical Technology Inc.

different from those urged in Berry's motion. TMT intends to abandon that claim. The Court should deny the remainder of the motion, however, because TMT stated plausible claims for breach of implied warranties.

## Standard of Review

Rule 12(b)(6) authorizes a court to dismiss a complaint for failure to state a claim. A complaint will survive such a motion if the plaintiff alleges enough facts to state a claim to relief that is plausible on its face. *See Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 140 (5th Cir. 2007). To show facial plausibility, the plaintiff should "plead[]factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing a defendant's motion, the Court should assume that all the allegations in the complaint are true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## Plaintiff's Allegations[2]

11.    This case stems from Defendants' failure to provide Level 3 compliant materials to Plaintiff, causing Plaintiff to sustain substantial damages.

12.    Plaintiff Texas Medical Technology Inc. f/k/a Texas Medical Center Supply LLC ("TMT") is a medical equipment supply company based in Houston, Texas. TMT manufactures, supplies and distributes medical safety

---

[2] For ease of reference, these paragraphs maintain the numbering in Plaintiff's First Amended Complaint. Dkt. 31 at 3–12.

equipment including personal protective equipment, such as facemasks, vinyl, latex, nitrile gloves, patient gowns, lab coats, and hand sanitizers. Due to the nature of the equipment, their intended uses are part and parcel to safety.

13.     The DLA[3] is the agency responsible for procurement for the United Stated armed forces and related agencies. The DLA entered contract SPE1C1-21-D-1421 (the "DLA Contract") with an entity called At Ease Sustainment, LLC for the procurement of level 3 surgical gowns ("Level 3 Gowns").[4]

14.     TMT was approved as the sole manufacturer of Level 3 Gowns to be supplied to the U.S. Government under the DLA Contract in 2020. As the sole manufacturer under the DLA Contract, TMT stood to earn profits in the tens of millions of dollars.

15.     Following TMT's designation, TMT communicated with Defendants Shlomo Mizrahi and Eliran Segal, as representatives of Defendant Textiles Shamen, S.A. de C.V. ("Textiles Shamen"), and entered into a supply contract. Pursuant to the supply contract, Textiles Shamen was to supply TMT with various materials necessary for the manufacture of Level 3 Gowns ("TS Supply Contract").

16.     Under the terms of the TS Supply Contract, Textiles Shamen represented and warranted that it "must act with the highest standards of quality and professionalism in the delivery of the PRODUCT, in accordance

---

[3] The Defense Logistics Agency.
[4]     https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns.

3

with this Contract." Additionally, Textiles Shamen represented and warranted that the Product supplied "must fulfil all technical specifications for the PRODUCT, as well as with the specifications for its individual packaging." TMT relied on these representations and warranties to fulfill its business obligations with third parties, such as the DLA.

17.     To supply TMT with the necessary Level 3 compliant materials, Textiles Shamen contracted with Defendants Berry Global Inc. and Bonlam, S.A. de C.V. for the purchase of fabric, which Textiles Shamen then sold to TMT (the "Product"). Berry and Bonlam knew the fabric was purchased for the benefit of TMT, and, upon information and belief, TMT was identified in the documentation that comprises the contract between Textiles Shamen and Berry and Bonlam. In other words, Berry and Bonlam sold fabric to Textiles Shamen for the purpose of being resold to TMT.

18.     Prior to Berry and Bonlam manufacturing the Product, Berry reached out to TMT on many occasions. Berry sent numerous emails and set up phone and video calls with TMT requesting information to open an account with Berry and information related to the Product TMT needed to be sent to its Houston facility. Berry and Bonlam knew, before the manufacture of the materials, that the Product it would supply to Textiles Shamen, would be used in Texas by TMT to make gowns. Berry and Bonlam also knew that TMT would look to them to correct or address any issues with Berry and Bonlam's fabric.

19.     Furthermore, Segal and Mizrahi formed Textiles Shamen Texas,

4

LLC to manage the manufacturing of the Level 3 Gowns in Houston. Segal and Mizrahi were to check the quality of the Product at the Textiles Shamen facility, send the Product to additional testing, and manage operations at TMT's Houston facility.

20.     Additionally, Segal and Mizrahi, as individuals, entered into an operating agreement with TMT, where Segal and Mizrahi agreed to be responsible for all day-to-day operations of the manufacturing of the gowns.

21.     Between February 2021 and April 2021, Segal and Mizrahi flew to Houston almost every two weeks and stayed in the TMT facility for many days at a time to ensure the quality of the Product and correct assembly of the gowns. While at the TMT Houston facility, Segal and Mizrahi also gave direct orders to personnel on how to assemble the gowns faster, how to move from different stages in the assembly line, and how the product should be packaged. Segal and Mizrahi represented to TMT that they had been conducting this type of quality control for over 30 years and have both the experience and knowledge to advise TMT on the manufacturing process.

22.     TMT supplied hundreds of thousands of units of the Product to the DLA.

23.     In April 2021, prior to using the Product, the DLA informed At Ease and TMT that the Products failed to meet the requisite criteria for Level 3 Gowns.

24.     Pursuant to the FDA:

Gowns are examples of personal protective equipment used in health care settings. They are used to protect the wearer from the spread of infection or illness if the wearer comes in contact with potentially infectious liquid and solid material. They may also be used to help prevent the gown wearer from transferring microorganisms that could harm vulnerable patients, such as those with weakened immune systems. Gowns are one part of an overall infection-control strategy.

A few of the many terms that have been used to refer to gowns intended for use in health care settings, include surgical gowns, isolation gowns, surgical isolation gowns, nonsurgical gowns, procedural gowns, and operating room gowns. In 2004, the FDA recognized the consensus standard American National Standards Institute/Association of the Advancement of Medical Instrumentation (ANSI/AAMI) PB70:2003, "Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities."

New terminology in the standard describes the barrier protection levels of gowns and other protective apparel intended for use in health care facilities and specifies test methods and performance results necessary to verify and validate that the gown provides the newly defined levels of protection:

> **Level 1:** Minimal risk, to be used, for example, during basic care, standard isolation, cover gown for visitors, or in a standard medical unit

> **Level 2:** Low risk, to be used, for example, during blood draw, suturing, in the Intensive Care Unit (ICU), or a pathology lab

6

**Level 3:** Moderate risk, to be used, for example, during arterial blood draw, inserting an Intravenous (IV) line, in the Emergency Room, or for trauma cases

A surgical gown is a personal protective garment intended to be worn by health care personnel during surgical procedures to protect both the patient and health care personnel from the transfer of microorganisms, body fluids, and particulate matter.[5]

The level 3 ANSI/AAMI designation means that the surgical gowns are to be used in moderate risk situations; to provide a barrier to larger amounts of fluid penetration through splatter and more fluid exposure through soaking than Level 2; for use in Arterial blood draw, Inserting an IV, and Emergency Room Trauma.[6]

25.    The ANSI standard documents state the following:

In the United States, surgical apparel, surgical drapes, and drape accessories are medical devices and, under the Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of May 28, 1976, are subject to regulation by the U.S. Food and Drug Administration (FDA), including but not limited to FDA requirements for premarket notification (section 510(k) of the Act) and medical device reporting. Barrier efficacy has long been recognized as important in helping to prevent infections and is now mandated by Occupational Safety and Health Administration (OSHA) regulations limiting occupational exposure to bloodborne pathogens (29 CFR 1910.1030). See also

---

[5] https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns

[6] Id.

the Centers for Disease Control and Prevention's (CDC's) Guideline for the prevention of surgical site infection (CDC, 1999; Mangram, et al., 1999).

Surgical gowns, other protective apparel, surgical drapes, and drape accessories are devices intended to promote infection control practices and help protect patients and health care workers. This standard is based on key barrier performance tests that are used to classify the subject products into levels of performance. Knowledge of these defined levels of performance will allow informed and consistent choices about the type of protective product necessary for the situation at hand.[7]

Health care personnel can be exposed to biological fluids capable of transmitting disease. Those diseases, which are caused by a variety of microorganisms, can pose significant risks to life and health. This is especially true of blood-borne pathogens such as the hepatitis B virus (HBV), hepatitis C virus (HCV), and human immunodeficiency virus (HIV). Patients can also be exposed to microorganisms and other contamination during surgical and other health care procedures. Because engineering controls cannot eliminate all possible exposures, attention is placed on the use of protective apparel, drapes, and drape accessories to reduce the potential for contact with blood, body fluids, OPIM, and microorganisms associated with these materials.

Health care workers wear protective apparel to help protect both the patient and themselves from the transfer of microorganisms by blood, body fluids, or OPIM. Drapes and drape accessories are also intended

---

[7] ANSI/AAMIPB70:2012; Foreword

to inhibit the transfer of microorganisms and are used to isolate the surgical incision from microorganisms and other contamination.

The barrier performance of a level 3 gown is a critical safety feature and a requirement to prevent the spread of fluid born pathogens between medical provider and patient. The sole purpose of the level 3 gown is personal protection and safety, and the failure of a gown to provide the standard of protection it is designed to provide puts the wearer and patient at risk of contracting serious and/or fatal pathogens.

This standard addresses the barrier performance of surgical gowns, isolation gowns, other protective apparel, surgical drapes, and drape accessories designed to help preserve the sterile field and/or protect health care workers during surgery and other health care procedures in which exposure to blood, body fluids, and OPIM might be anticipated.[8]

26.    Specifically, the DLA conducted tests showing that the fabric supplied by Berry and Bonlam (and purchased through Textiles Shamen) did not meet the required levels of liquid permeability for Level 3 protection.

27.    On September 21, 2021, the DLA terminated the DLA Contract (the "Termination") for cause, for failing to supply the Product with materials in accordance with the specifications required by the DLA.

28.    On September 27, 2021, during TMT's investigation of the DLA's Termination, representatives from TMT and Defendants Berry and Bonlam

---

[8] ANSI/AAMIPB70:2012; Appendix A

engaged in detailed discussions regarding the Product failures (the "Berry Call"). During the Berry Call, representatives of Berry made several damning admissions. Specifically, representatives from Berry admitted that the raw materials supplied to Textiles Shamen were not capable of satisfying the requirements of Level 3 compliant Sterile Disposable Surgical Gowns. The Berry representatives explained that their original failures were caused by faulty machinery which required a two-month plant closure for equipment cleaning and process redesign. Additionally, remedial measures taken to fix this problem occurred only after Berry supplied the defective fabric to Textiles Shamen for use of the Product. Berry's representatives stated that any additional fabric supplied and used by TMT would be a "totally different product," which was modified "in order to warranty the level required."

29.     The information gathered on the Berry Call clearly shows that Defendants Berry and Bonlam knowingly produced a defective product for use in surgical gowns that would be supplied to the U.S. Government.

30.     Furthermore, the defective Product impacted a number of TMT contracts, some of which were lost, cancelled, resulted in customer demands for refunds, and some of which TMT's customers stopped purchasing from TMT all together.

31.     Additionally, TMT made payments to Textiles Shamen for Products that TMT never received.

32.     Furthermore, because of the defective Product, TMT had to issue

a recall for the Level 3 Gowns, which the FDA classified as a Class 2 Recall.

33.     TMT acted in accordance with the provisions of the agreements with Defendants and fulfilled its obligations. Defendants failed to fulfill their obligations pursuant to the provisions of the agreements causing TMT substantial damages.

34.     Despite TMT's demands for Defendants to reimburse TMT for the damages Defendants caused, Defendants have refused.

## Argument & Authorities

### A.     Third-Party Beneficiary Claims

TMT alleged that (1) TMT contracted with Textiles Shamen for the provision of Level 3 compliant materials, and (2) that Textiles Shamen subcontracted with Berry to provide some of those materials. Dkt. 31 at 12–13 (¶¶ 37–38). Specifically, TMT alleged that:

> Upon information and belief, the contract between Textiles Shamen and Berry and Bonlam specifically identified TMT as a third-party beneficiary. TMT had numerous communications with Berry and Bonlam regarding Level 3 material specifications. Berry and Bonlam agreed to provide the Level 3 gown material in full compliance with the required specification.

Dkt. 31 at 13 (¶ 38).

Berry moved to dismiss the third-party beneficiary claim on two grounds. First, Berry argued that the allegations were "conclusory and need not be accepted as true by the Court." Dkt. 37 at 8. Second, Berry argued that TMT's

11

allegations that "Textiles Shamen contracted with Berry . . . to provide Level 3 gown materials" and that "Berry and Bonlam provided Textiles Shamen, and therefore TMT, with defective materials, which were not Level 3 compliant" did not allege a breach. In other words, Berry suggested that even if it promised to deliver A but actually delivered B, "that is no breach at all." Dkt. 37 at 12.

Berry's down-is-up illogic is only one of many flaws in its challenge to the third-party beneficiary claim. However, after Berry filed its motion, counsel for the parties conferred and agreed to engage in an informal document exchange. After reviewing the documents, TMT's counsel learned of an actually fatal flaw to the third-party beneficiary claim. Specifically, counsel's "information and belief" that "the contract between Textiles Shamen and Berry and Bonlam specifically identified TMT as a third-party beneficiary" was incorrect. The contracts themselves do not, in fact, specifically identify TMT as a third-party beneficiary. TMT recognizes that that is an essential element of a third-party beneficiary claim.[9]

---

[9] According to the First Court of Appeals,

> To determine third-party beneficiary status, we look solely to the language of the contract, construed as a whole. The contract must include a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party; any implied intent is insufficient. The contract need not state 'third-party beneficiary' or any similar "magic words." We do not presume intent to create third-party beneficiary status. Instead, we must begin with the presumption that the contracting parties intended to

Accordingly, because TMT was not specifically identified as a third-party beneficiary in the Textiles Shamen-Berry contract, TMT will stipulate to the dismissal of its third-party beneficiary claim against Berry and will file the appropriate paperwork.

## B.     Breach of Implied Warranties

TMT sued Berry for breach of two alternative implied warranties: the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. Dkt. 31 at 15–16. Berry challenges both claims on four theories: (1) that there were no allegations that TMT used Berry's fabric for its ordinary purpose; (2) that there were no allegations that TMT used Berry's fabric for an unusual purpose or a purpose that went unfulfilled; (3) that there were no allegations supporting an inference of TMT's reliance on Berry; and (4) that Berry is an "upstream manufacturer" who cannot be liable under *Hininger*. Each theory fails, so the Court should deny the motion.

### 1.     *Legal Context*

When a seller sells goods, the law imposes either of two complementary implied warranties: the implied warranty of merchantability and the implied

---

contract solely for themselves, and only a clear expression of intent to create a third-party beneficiary overcomes this presumption.

*West Loop Hospitality LLC v. Houston Galleria Lodging Associates LLC*, 649 S.W.3d 461, 481 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (citations omitted).

warranty of fitness for a particular purpose. Tex. Bus. Com. Code §§ 2.314, 2.315. Which warranty applies depends on the buyer's use. Generally, the implied warranty of merchantability applies. But if the buyer had "some unusual, out of the ordinary purpose peculiar to the needs of an individual buyer," the implied warranty of fitness for a particular purpose applies. *Coghlan v. Aquasport Marine Corp.*, 75 F. Supp. 2d 769, 774 (S.D. Tex. Oct. 8, 1999); *see also* Tex. Bus. Com. Code § 2.315; *ASAI v. Vanco Insulation Abatement, Inc.*, 932 S.W.2d 118, 121 (Tex. App.—El Paso 1996, no writ).

The line between an ordinary purpose and a particular purpose can be difficult to draw. For example, in *Bob Davis Paint & Drywall Inc. v. Valspar Corp.*, the buyer bought "exterior house paint" from the seller for use on "beachfront houses that are exposed to salt air, high heat, and high humidity." 452 F. Supp. 3d 589, 592 (S.D. Tex. 2020). When the paint peeled, the buyer sued the seller on both warranties. The seller moved to dismiss, but Judge Brown allowed both claims to proceed. Regarding the merchantability claim, Judge Brown noted, the buyer "has pleaded facts that at least invoke a plausible defect: Paint is not supposed to peel off houses." *Id.* at 598. Regarding the particular purpose claim, Judge Brown noted, "Just because Davis was using the paint as it ought to be used—applying it to the exterior of homes— does not mean that his particular purpose was not unique. The paint was still used as paint, but not on ordinary homes." *Id.* at 599. Judge Brown allowed

14

both claims to proceed.[10]

At this early stage of the case, before any discovery has been conducted, it is difficult to determine whether TMT's use of Berry's fabric to manufacture Level 3 gowns was an ordinary use or a particular purpose. Like the paint in *Valspar*, Berry's fabric was a product Berry routinely manufactured and that was routinely used to make protective clothing. But, like the painter in *Valspar*, just because TMT was using the fabric as it ought to be used—making protective clothing—does not mean that TMT's particular purpose was not unique.

Whether TMT's particular purpose is ordinary or not need not be proved at this stage. "Even if two claims cannot both succeed—an issue that the Court does not decide at this juncture—[a plaintiff] is permitted to plead the two claims in the alternative." *Sysco Merchandising & Supply Chain Services Inc. v. Remcoda LLC*, No. 4:22-cv-02075 (S.D. Tex. Feb. 6, 2023) (citing Fed. R. Civ. P. 8(d)(2)); *see also Bob Davis Paint & Drywall Inc. v. Valspar Corp.*, 452 F. Supp. 3d 589, 598–99 (S.D. Tex. 2020) (allowing claims on both warranties to survive Rule 12(b)(6)). Thus, given the ambiguities in the law and the facts, TMT has alleged breaches of both warranties.

## 2.   *TMT's Allegations*

TMT contracted with Textiles Shamen to supply certain materials

---

[10] According to PACER, the case settled at mediation, and the issue was not resolved.

necessary to manufacture Level 3 gowns. Dkt. 31 at 4 (¶ 15). Textiles Shamen,

in turn, contracted with Berry to supply fabric that was then re-sold to TMT.

Dkt. 31 at 5 (¶ 17). Berry then contacted TMT for details on the fabric:

> Berry reached out to TMT on many occasions. Berry
> sent numerous emails and set up phone and video calls
> with TMT requesting information to open an account
> with Berry and information related to the Product
> TMT needed to be sent to its Houston facility. Berry
> and Bonlam knew, before the manufacture of the
> materials, that the Product it would supply to Textiles
> Shamen, would be used in Texas by TMT to make
> gowns. Berry and Bonlam also knew that TMT would
> look to them to correct or address any issues with
> Berry and Bonlam's fabric.

Dkt. 31 at 5 (¶ 18).

Berry sold that fabric to Textiles Shamen, who checked the quality of the

fabric and "manage[d] operations at TMT's Houston facility." Dkt. 31 at 6 (¶

19). Textiles Shamen's principals, Segal and Mizrahi, were to "be responsible

for all day-to-day operations of the manufacturing of the gowns," including

staying "in the TMT facility" and giving "direct orders to personnel on how to

assemble the gowns faster, how to move from different stages in the assembly

line, and how the product should be packaged." Dkt. 31 at 6 (¶¶ 20, 21).

It turned out that Berry's fabric was defective. Specifically, it was not

sufficiently impermeable to be used to manufacture Level 3 compliant gowns.

Dkt. 31 at 10 (¶ 26). TMT contacted Berry about the defect, and "Berry

admitted that the raw materials . . . were not capable of satisfying the

requirements of Level 3 compliant Sterile Disposable Surgical Gowns." Dkt. 31 at 11 (¶ 28). Berry then promised to take remedial actions and that future deliveries would meet TMT's requirements. Dkt. 31 at 11 (¶ 28).

### 3.   *Berry breached the implied warranty of merchantability.*

Berry's failure to provide suitably impermeable fabric was a breach of the implied warranty of merchantability. Berry's fabric was supposed to be impermeable; it was not.[11]

The elements of a claim for breach of implied warranty of merchantability are: (1) the defendant sold or leased a product to the plaintiff; (2) the product was unmerchantable; (3) the plaintiff notified the defendant of the breach; and (4) the plaintiff suffered injury. Tex. Bus. Com. Code § 2.314; *Helen of Troy, L.P. v. Zotos Corp.*, 511 F. Supp. 2d 703, 724–25 (W.D. Tex. 2006). It bears noting that merchantability is defined by statute and does not turn on the buyer's intended or actual use. *See* Tex. Bus. Com. Code § 2.314(b). Rather, goods are unmerchantable if they are defective in one of six different ways, including goods that are not fit for their ordinary purpose and goods that are objectionable in the trade under the contract description. Tex. Bus. Com. Code § 2.314(b).

The first element—that Berry and Bonlam sold or leased a product to

---

[11] For present purposes, it will suffice to use the term "impermeable" as a shorthand for the level of impermeability required by the ANSI specifications and the purchase orders sent to Berry.

TMT—falls under the *Hininger* question discussed below. Texas law allows a purchaser to sue an "upstream manufacturer" if the buyer expected the manufacturer to "resolve any problem they might experience with the" product. *See Hininger v. Case Corp.*, 23 F.3d 124, 128 (5th Cir. 1994). Here, Berry contacted TMT regarding the fabric requirements, TMT contacted Berry when the fabric did not meet those requirements, and Berry promised to fix the problem for future shipments. Dkt. 31 at 5, 11. Thus, TMT adequately alleged the first element.

Second, TMT alleged that Berry and Bonlam's fabric was unmerchantable. That term is defined in Tex. Bus. Com. Code § 2.314(b), and means that the fabric would, among other things, pass without objection in the trade under the contract description. Tex. Bus. Com. Code § 2.314(b)(1). Put colloquially, this means that the buyer must get what they ordered. TMT alleged that it ordered fabric that would meet certain specifications and that Berry's fabric did not meet those specifications. Dkt. 31 at 5, 10. Thus, TMT adequately alleged the second element.

Third, TMT alleged that it notified Berry of the breach. Berry acknowledged its fault and promised to do better next time. Dkt. 31 at 11 (¶ 28).

And fourth, TMT alleged that it suffered injury as a result of Berry's breach: because of the defective fabric, TMT "had to issue a recall for the Level 3 Gowns," "the DLA terminated the DLA Contract," and TMT suffered

damages. Dkt. 31 at 10, 12 (¶¶ 27, 32).

Thus, TMT adequately pleaded a claim that Berry breached the implied warranty of merchantability.

### 4.   *Berry breached the implied warranty of fitness for a particular purpose.*

The elements of a claim for breach of the implied warranty of fitness for a particular purpose, on the other hand, are: (1) the buyer had a particular purpose for buying the goods, which was "some unusual, out of the ordinary purpose peculiar to the needs of an individual buyer"; (2) the seller had reason to know the particular purposes for which the goods were required at the time of contract; (3) the buyer relied on the seller's skill or judgment to select or furnish suitable goods; and (4) the goods were unfit for that particular purpose. *See* Tex. Bus. Com. Code § 2.315; *Coghlan v. Aquasport Marine Corp.*, 75 F. Supp. 2d 769, 774 (S.D. Tex. Oct. 8, 1999).

First, TMT alleged that it had a particular purpose for buying the fabric: the manufacture of Level 3 gowns pursuant to a supply contract with the federal government. Dkt. 31 at 15–16 (¶¶ 50–52).

Second, TMT alleged that Berry had reason to know TMT's particular purpose: TMT and Berry had conversations "before the manufacture of the materials" regarding "the Product TMT needed" and that it "would be used in Texas by TMT to make gowns." Dkt. 31 at 5 (¶ 18).

Third, TMT alleged that it relied on Berry's skill and judgment to select

19

and furnish suitable goods: TMT's conversations about the product, including what exactly to order, were with Berry. Dkt. 31 at 5, 15–16 (¶¶ 18, 50).

And fourth, TMT alleged that Berry's fabric was not fit for TMT's particular purpose: It was supposed to be impermeable; it was not. . Dkt. 31 at 5, 10.

Thus, TMT adequately pleaded a claim that Berry breached the implied warranty of fitness for a particular purpose.

## 5.   *Hininger does not immunize Berry*.

Berry additionally argues that it is an "upstream manufacturer" and that upstream manufacturers are protected from implied warranties. But the Texas Supreme Court has specifically held, on many occasions, that a plaintiff *can* recover on an implied warranty claim against an upstream defendant. *See MAN Engines & Components Inc. v. Shows*, 434 S.W.3d 132, 137 (Tex. 2014) (holding that a purchaser of used goods can pursue a manufacturer for breach of implied warranty); *Nobility Homes of Texas Inc. v. Shivers*, 557 S.W.2d 77, 78 (Tex. 1977) (holding that a purchaser of new goods from an independent dealer can pursue a manufacturer for breach of implied warranty). The test for whether a buyer can pursue an "upstream manufacturer" does not turn on the number of steps between the buyer and the manufacturer, rather, it turns on whether "the [buyer] had no expectation that [the manufacturer] would resolve any problem they might experience with the [end product]." *See Hininger v. Case Corp.*, 23 F.3d 124, 128 (5th Cir. 1994). This makes even more sense

20

where, as here, the buyer is not the end user of the good but another step in

the manufacturing process.

In the case at bar, TMT alleged that it had every expectation that Berry

would resolve problems with the fabric:

> Prior to . . . manufacturing the Product, Berry reached
> out to TMT on many occasions. Berry sent numerous
> emails and set up phone and video calls with TMT
> requesting information to open an account with Berry
> and information related to the Product TMT needed
> . . . . Berry and Bonlam knew, before the manufacture
> of the materials, that the Product it would supply to
> Textiles Shamen, would be used in Texas by TMT to
> make gowns. Berry and Bonlam also knew that TMT
> would look to them to correct or address any issues
> with Berry and Bonlam's fabric.

Dkt. 31 at 5 (¶ 18). After TMT learned that Berry's fabric was defective,

> TMT and Defendants Berry and Bonlam engaged in
> detailed discussions regarding the Product failures
> (the "Berry Call"). During the Berry Call, . . . Berry
> admitted that the raw materials supplied to Textiles
> Shamen were not capable of satisfying the
> requirements of Level 3 compliant Sterile Disposable
> Surgical Gowns. The Berry representatives explained
> that their original failures were caused by faulty
> machinery . . . . Additionally, remedial measures taken
> to fix this problem occurred only after Berry supplied
> the defective fabric to Textiles Shamen for use of the
> Product. Berry's representatives stated that any
> additional fabric supplied and used by TMT would be
> a "totally different product," which was modified "in
> order to warranty the level required."

21

Dkt. 31 at 11.

In other words, TMT expected Berry to resolve any issues with the fabric because TMT had communicated with Berry directly regarding the fabric. And, in fact, TMT did look to Berry to resolve the issues with the fabric. Thus, under the law, TMT can sue Berry for breach of implied warranties.

## 6.   *Conclusion*

Berry raised four arguments against TMT's implied warranty claims. First, Berry argued that there were no allegations that TMT used Berry's fabric for its ordinary purpose. But as set forth above , that is not an essential element of either claim. Second, Berry argued that that there were no allegations that TMT used Berry's fabric for an unusual purpose or a purpose that went unfulfilled. But as set forth above , TMT alleged exactly that. Third, Berry argued that there were no allegations supporting an inference of TMT's reliance on Berry. But as set forth above , TMT alleged exactly that. And fourth, Berry argued that it is an "upstream manufacturer" who cannot be liable under *Hininger*. But as set forth above, *Hininger* does not immunize Berry from being liable for supplying defective fabric because TMT expected Berry to stand behind the quality of its fabric.

Each of Berry's arguments fails. The Court should therefore deny Berry's motion with respect to TMT's implied warranty claims.

## Prayer

The Court should deny Berry's motion to dismiss TMT's implied

warranty claims because they have been adequately pled. The Court should deny Berry's motion to dismiss TMT's contractual claims as moot because TMT will stipulate to the dismissal of that claim. TMT asks for this and such other and further relief to which it may be entitled.

Respectfully submitted,


*/s/ James Ardoin*
JAMES ARDOIN
State Bar No. 24045420
Email: jimmy@jimmyardoinlaw.com
JIMMY ARDOIN & ASSOCIATES PLLC
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
P: (713) 574-8900
F: (713) 574-1404

GEORGE J. HITTNER
State Bar No. 24038959
S.D. TX No. 431901
Email: george@thehittnergroup.com
**The Hittner Group, PLLC**
P.O. Box 541189
Houston, Texas 77254
Phone: (713) 505-1003

Jeremy M. Masten
Texas Bar No. 24083454
jeremy@themastenlawfirm.com
P.O. Box 541411
Houston, Texas 77254
(254) 307-9185

23

THE SHEENA LAW FIRM
Danny M. Sheena, P.E.
Texas Bar No. 00792830
Jason P. Scofield
Texas Bar No. 24060578
Megan Sheena
Texas Bar No. 24132004
2500 W. Loop South, Suite 518
Houston, Texas 77027
(713) 224-6508 – tel
(713) 225-1560 – fax
service@sheenalawfirm.com

*Counsel for Plaintiff*

## Certificate of Service

I certify that on March 22, 2024, the foregoing instrument was served on all parties through their counsel of record, including those listed below, through the Court's CM/ECF system.

| Berry Global Inc. Bonlam, S.A. de C.V. | Brice A. Wilkinson |
|---|---|

*/s/ James Ardoin*
James Ardoin

24